**WO**

**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Michael Joe Murdaugh, | )    No. CV 09-831-PHX-FJM |
|       Petitioner, | ) |
| | )    <u>DEATH PENALTY CASE</u> |
| vs. | ) |
| | ) |
| | )    **ORDER** |
| Charles L. Ryan, et al., | ) |
|       Respondents. | ) |

The court has before it Petitioner Michael Murdaugh's Petition for Writ of Habeas Corpus (Doc. 35), Respondents' Answer (Doc. 38), Petitioner's Reply (Doc. 41), Petitioner's Motion for Evidentiary Development (Doc. 51), Respondents' Response (Doc. 52), and Petitioner's Reply (Doc. 53).

## I.  BACKGROUND

Petitioner was convicted and sentenced to death for the 1995 murder of David Reynolds.  The following facts concerning the crime are based on the Arizona Supreme Court's opinion in *State v. Murdaugh*, 209 Ariz. 19, 22-26, 97 P.3d 844, 847-51 (2004), and this court's review of the record.

On June 26, 1995, Petitioner's girlfriend, Rebecca Rohrs, met the victim, David Reynolds, at a gas station.  Rohrs told Reynolds that she was looking for a job and Reynolds indicated he might be able to help her.  Rohrs gave Reynolds a copy of her resumé and the two exchanged phone numbers.  At some point in the conversation, Reynolds offered to pay Rohrs for oral sex.  Rohrs declined and went home.

When Rohrs arrived at the home she shared with Petitioner, she told him what had happened at the gas station. Petitioner decided to teach Reynolds a lesson and instructed Rohrs to contact Reynolds and invite him to the house.

Rohrs paged Reynolds and invited him to party with her and her friend, Betty Gross. Reynolds returned the page. While Rohrs was talking to Reynolds, Petitioner stood nearby and told her what to say. After the call, Petitioner and a friend, Jesse Dezarn, left to buy methamphetamine. They instructed Rohrs and Gross to page them as soon as Reynolds arrived. Petitioner also told them to make sure Reynolds did not leave before he returned.

Approximately fifteen minutes after Reynolds arrived, Petitioner and Dezarn entered the house brandishing firearms. Petitioner shouted at Reynolds, demanding to know why he thought that he could treat Rohrs "like a whore." Petitioner continued to yell at Reynolds while Gross and Rohrs left the house to remove anything of value from Reynolds' van. Reynolds remained in the house with Dezarn and Petitioner, both of whom continued to wave their guns. Petitioner ordered Reynolds to empty his pockets onto the coffee table. Reynolds had about $200 in cash. At some point in the evening Petitioner took the money.

While Rohrs and Gross were unloading the van, Petitioner went outside and reprimanded them for not wearing gloves. He told them that they had left fingerprints on everything and asked, "Do you know what I am going to have to do now?" Petitioner instructed Gross and Rohrs to wipe the equipment clean of fingerprints and to put everything back in Reynolds' van. Reynolds likely heard this exchange.

Petitioner returned to the house and at his request Rohrs brought him a baseball bat. He asked Rohrs if she would like to take a swing at Reynolds' head. She declined. Petitioner also told Gross to take a swing at Reynolds, but she too refused.

At about 11:30 p.m., after Rohrs, Petitioner, Dezarn, and Gross ate dinner, Petitioner led Reynolds to the garage. Dezarn, still armed with a firearm, walked behind Reynolds. Inside the garage, Petitioner ordered Reynolds into the trunk of his Buick so that he could "figure things out." Throughout the night, Petitioner, Dezarn, Gross, and Rohrs returned to

the garage to take methamphetamine.

In the early morning hours of the next day, Dezarn and Petitioner agreed that they needed to get rid of Reynolds' van. They decided to "ditch" it near Whitman Cemetery. Petitioner led the way in his truck while Dezarn followed in Reynolds' van. They abandoned the van on Cemetery Road and began driving back to Petitioner's house. On the way, they stopped for gas in Whitman and ran into an acquaintance named Ron Jesse. They asked Jesse for drugs, and all three returned to Petitioner's house. From there, Dezarn and Jesse left to get more methamphetamine with the money Petitioner had taken from Reynolds.

After Dezarn and Jesse returned with the drugs, they and Petitioner locked themselves in the garage to shoot up. While in the garage, Petitioner told Jesse what happened to Rohrs at the gas station and that he had Reynolds locked in the trunk.

At about 8:30 a.m., Petitioner opened the door to the garage and allowed Gross and Rohrs to join him, Dezarn, and Jesse to take more drugs. When Petitioner opened the trunk to show Jesse that Reynolds was there, Reynolds stated that he needed to relieve himself. Petitioner let Reynolds out of the trunk and took him to the corner of the garage to urinate. While Reynolds' back was turned, Petitioner struck him in the head with a nylon meat tenderizer. Reynolds fell to the floor. Petitioner picked up a jack hammer spike and continued to hit him in the face and head. The attack caused three major crushing blows to Reynolds' skull, resulting in his death. At some point, Petitioner placed a bag over Reynolds' head.

Petitioner left Reynolds lying face down in the garage with the bag tied over his head. He instructed Gross and Rohrs to sprinkle horse manure over Reynolds' body and on the blood surrounding his body. The body was left in this condition for the rest of the day.

At some point after the murder Jesse attempted to leave Petitioner's home but was unable to do so because of a locked gate. When Petitioner arrived to unlock the gate he threatened Jesse, stating that if Jesse told anyone what had happened in the garage he would "kill [Jesse] last and peel the skin off his children." Petitioner then opened the gate and

allowed Jesse to leave.

Around the time of the murder, Petitioner realized that he and Dezarn had left items in the van that would show it belonged to Reynolds. Petitioner directed Dezarn and Rohrs to remove the items. Dezarn retrieved Reynolds' pagers, wallet, and identification papers and returned to Petitioner's house with Rohrs.

Later that evening, Petitioner and Dezarn loaded Reynolds' body into Petitioner's horse trailer. Petitioner told Rohrs to clean up the blood in the garage. He then packed to go on a camping trip, leaving some time after midnight.

Once at his campsite, Petitioner dismembered Reynolds' body in an effort to prevent its identification. First, he cut off Reynolds' head and hands. He then removed the finger pads from the hands and pulled all of Reynolds' teeth. He threw the teeth and finger pads out the window of his truck as he drove along a forest service road. He then buried the head and hands in one shallow grave and the torso in another. He returned to his campsite, where he placed several calls to Rohrs using Reynolds' cell phone.

The police, having been notified by Reynolds' family of his disappearance, obtained copies of Reynolds' cell phone records. They discovered that on June 26 Reynolds had made several calls to his company and his girlfriend, and that he had also called Rohrs five times. Officers contacted Rohrs on June 28, and she told them that she had Reynolds' business card and was willing to come to the Sheriff's Office to look at a photograph of Reynolds. Rohrs never went to the Sheriff's Office to make the identification. On June 29, the police discovered that Reynolds' cell phone had been used to make several additional calls to Rohrs on June 28.

On June 29, police located Reynolds' van. They found his work boots in the vehicle and discovered that his cell phone was missing. They learned that the most recent calls from the cell phone originated from the Flagstaff area. The same day, the police were contacted by a resident of Whitman who told them that a murder had taken place in Petitioner's garage. After contacting another witness, the police interviewed Ron Jesse, who told them that he

had witnessed Reynolds' murder.

During their phone conversations, Rohrs told Petitioner that the police were tracking the calls he made with Reynolds' cell phone. Petitioner left his campsite and called Rohrs from a pay phone. She told him that she had been contacted by the police but had not told them anything. Petitioner broke Reynolds' cell phone into pieces and disposed of it, along with Reynolds' wallet and papers, near Reynolds' body. Back at the campsite, Petitioner was cleaning one of his horse's hooves when his knife slipped and severely cut his leg. He went to the Yavapai Regional Medical Center for treatment.

On June 30, 1995, the police obtained a search warrant for Petitioner's home and garage. They found blood stains covered with horse manure on the garage floor.

The Maricopa County Sheriff's Office notified other law enforcement agencies that they were looking for Petitioner. The Yavapai County Sheriff's Office called the investigators and informed them that Petitioner was in the emergency room at the Yavapai Regional Medical Center. The investigators asked the Yavapai authorities to impound Petitioner's vehicle and then went to the hospital to contact Petitioner.

Detective Griffiths of the Maricopa County Sheriff's Office spoke with hospital personnel, confirming that Petitioner had not been given any pain medication. He then met with Petitioner at approximately 8:55 p.m. on June 30. He read Petitioner the *Miranda* warnings and Petitioner agreed to answer questions. Petitioner asked whether his garage had been cleaned. When informed that it had not, he responded, "Then you have enough to do me in." He then described Reynolds' murder and provided Detective Griffiths with a detailed map and directions to the campsite. He also told Griffiths where to find Reynolds' body and personal effects. Police located the body the next day.

The detectives also questioned Petitioner about the murder of Douglas Eggert, which had occurred earlier in 1995 and bore similarities to the Reynolds murder. Petitioner admitted that he had killed Eggert by beating him to death with a meat tenderizer and then throwing the body into a canal.

On January 10, 2000, Petitioner pled guilty to the kidnapping, robbery, and first degree murder of Reynolds. He also pled guilty to the kidnapping and first degree murder of Eggert. The State and Petitioner agreed that he would receive a life sentence for the murder of Eggert. Petitioner also acknowledged that his guilty plea to the Eggert murder would be used as an aggravating factor in the Reynolds case.

At sentencing, the trial court found that the State had proved two aggravating circumstances with respect to the Reynolds murder: that Petitioner had been convicted of another offense for which a sentence of life imprisonment or death was imposable, pursuant to A.R.S. § 13-703(F)(1), and that he committed the murder in an especially heinous, cruel, or depraved manner under § 13-703(F)(6).[1] Although Petitioner waived the presentation of mitigating evidence, the trial court found eight nonstatutory mitigating circumstances, based primarily on the effects of Petitioner's drug abuse, personality disorder, and paranoia. The court determined, however, that these circumstances were not sufficiently substantial to outweigh the aggravating factors, and sentenced Petitioner to death.

On direct appeal to the Arizona Supreme Court, Petitioner raised two claims in his opening brief. First, he argued that *Ring* error was not harmless.[2] Appellant's Opening Brief at 8-11. Second, he contended that his plea agreement was "not enforceable" because he could not have knowingly and voluntarily waived his rights when he was not informed that he had a right to a jury determination of his sentence under *Ring*. *Id.* at 11-13. The Arizona Supreme Court rejected these claims. *Murdaugh*, 209 Ariz. at 28-33, 97 P.3d at 853-58.

At oral argument before the Arizona Supreme Court, Petitioner raised two new claims: that the delay in his case constituted cruel and unusual punishment and that he had been incompetent to plead guilty. *Id.* at 26, 97 P.3d at 851. The Arizona Supreme Court, after

---

[1]    Effective January 1, 2009, A.R.S. § 13-703 was renumbered to § 13-751.

[2]    *Ring v. Arizona*, 536 U.S. 584 (2002), invalidated the capital sentencing scheme under which aggravating factors were found by a judge rather than a jury. *See* Claims 1 and 2 below.

reviewing the claims for fundamental error and finding none, deemed both claims waived. *Id.* at 26-27, 97 P.3d at 851-52. The court affirmed Petitioner's convictions and death sentence. *Id.* at 37, 97 P.3d at 862.

Petitioner filed an Amended Petition for Post-Conviction Relief ("PCR") on November 4, 2005, raising 12 claims. (Doc. 31, Ex. 39.) The PCR court held an evidentiary hearing on Petitioner's claim of ineffective assistance of counsel at sentencing.[3] The court denied the claim and dismissed the remaining claims, the majority of which challenged Petitioner's competence to plead guilty and waive mitigation, as precluded or not colorable. (*Id.*, Ex's. 93, 98.) Petitioner filed a petition for review, which the Arizona Supreme Court summarily denied. Petitioner then commenced proceedings in this court.

## II. APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

## A. Principles of Exhaustion and Procedural Default

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is fairly presented if the petitioner has described the operative facts and the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). A petitioner must clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386

---

[3] Judge Sherry Hutt presided over Petitioner's trial and sentencing. Judge Warren Granville presided over the PCR proceedings.

F.3d 896, 913 (9th Cir. 2004). He must make the federal basis of the claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify his omission of the claim from a prior petition or his failure to present the claim in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (district court must consider whether the claim could be pursued by any presently available state remedy).

Therefore, in the present case, if there are claims that were not raised previously in state court, the court must determine whether Petitioner has state remedies currently available to him pursuant to Rule 32. *Id.* If no remedies are currently available, Petitioner's claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1.

If there are claims that were fairly presented in state court but found defaulted on state procedural grounds, such claims will be found procedurally defaulted in federal court so long

as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). It is well established that Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002), and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See Ortiz*, 149 F.3d at 932 (Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996); *see also Ramirez v. Ryan*, No. CV-97-1331-PHX-JAT, 2010 WL 1268138 (D. Ariz. 2010) (May 30, 2010).

Nonetheless, because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, however, the court will not review the merits of a procedurally defaulted claim unless the petitioner demonstrates legitimate cause for his failure to exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. Objective factors that constitute cause include interference by officials that makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *King v. LaMarque*, 455 F.3d 1040, 1045 (9th Cir. 2006). "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a petitioner bears the burden of showing not merely that the errors at his trial were possibly prejudicial, but that they worked to his actual and substantial

disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

Two kinds of claims are recognized under the fundamental miscarriage of justice exception: that a petitioner is "innocent of the death sentence" (in other words, that the death sentence was erroneously imposed); and that a petitioner is innocent of the capital crime. In the first instance, the petitioner must show by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the existence of any aggravating circumstance or other condition of eligibility for the death sentence under the applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 336, 345 (1992). In the second instance, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). To establish the requisite probability, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* Such a showing is "extremely rare," and "requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* at 324; *see also House v. Bell*, 547 U.S. 518, 537 (2006).

Finally, a federal habeas court may reject a claim on the merits without reaching the question of exhaustion. 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *see Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under (b)(2) as "plainly meritless"); *Washington v. Lampert*, 422 F.3d 864, 871 (9th Cir. 2005).

**B.    Standard for Habeas Relief**

For properly exhausted claims, the AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly

deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).[4]

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be

---

[4]     The court rejects Petitioner's contention that the AEDPA is unconstitutional. (*See* Doc. 35 at 8-10.) The AEDPA violates neither the Suspension Clause nor the separation of powers doctrine. *See, e.g.*, *Felker v. Turpin*, 518 U.S. 651, 664 (1996); *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007), *reh'g and reh'g en banc denied,* 508 F.3d 1261 (9th Cir. 2007); *Allen v. Ornoski*, 435 F.3d 946, 960-61 & n.11 (9th Cir. 2006).

1   "persuasive" in determining what law is clearly established and whether a state court applied

2   that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

3       The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

4   The Court has explained that a state court decision is "contrary to" the Supreme Court's

5   clearly established precedents if the decision applies a rule that contradicts the governing law

6   set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

7   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

8   indistinguishable from a decision of the Supreme Court but reaches a different result.

9   *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In

10  characterizing the claims subject to analysis under the "contrary to" prong, the Court has

11  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

12  facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

13  clause." *Williams*, 529 U.S. at 406.

14      Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

15  may grant relief where a state court "identifies the correct governing legal rule from [the

16  Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

17  "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

18  where it should not apply or unreasonably refuses to extend that principle to a new context

19  where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

20  application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner

21  must show that the state court's decision was not merely incorrect or erroneous, but

22  "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

23      Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

24  court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*,

25  545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

26  determination will not be overturned on factual grounds unless objectively unreasonable in

27  light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340;

28

*see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.  But only the state court's factual findings, not its ultimate decision, are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42.  *But see Wood v. Allen*, 130 S. Ct. 841, 851 (2010)  (electing not to resolve "how and when" § 2254(e)(1)'s requirement that a petitioner rebut a state court's presumptively correct factual determinations with "clear and convincing evidence" applies in challenges to state court findings of fact under § 2254(d)(2)).

## III.  CLAIMS

Petitioner sets forth 20 claims in his habeas petition.  Respondents concede that 10 claims are properly exhausted in whole or in part.  They contend that Claims 5, 6, 9, 10, 11, 13, 14, 17, 19, and 20 are procedurally barred.  Petitioner seeks evidentiary development with respect to all but two of his claims.  Respondents contend that Petitioner is not entitled to evidentiary development.  The court will first address, as necessary, the procedural status and merits of Petitioner's claims.  The court will then consider Petitioner's requests for evidentiary development.

Petitioner's principal claims are based on his assertion that his guilty pleas and waiver of the presentation of mitigating evidence were not valid due to his mental incompetence.  In addition, according to Petitioner, both defense counsel and the trial court failed to take Petitioner's incompetence into account in allowing him to plead guilty and waive mitigation.  The Court will first discuss the claims relating to Petitioner's guilty pleas.

## A.    Guilty Pleas: Claims 8-11

Petitioner contends that he was mentally incompetent to enter a knowing, voluntary, and intelligent guilty plea, that defense counsel performed ineffectively in handling the issue, and that the trial court failed to make an adequate competency determination before accepting the guilty pleas.

Background

At trial and sentencing Petitioner was represented by Jess Lorona, pursuant to
Lorona's contract with the Maricopa County Office of Court Appointed Counsel ("OCAC").
Lorona was assisted by co-counsel (first Patricia Gitre, then Peter Claussen), investigators
(Stella Salinas and Jeff Bachtle), and a mitigation specialist (first Holly Wake, then Linda
Christianson).

On November 20, 1998, at the request of defense counsel, the trial court ordered that
Petitioner undergo a competency screening evaluation "in preparation for a possible Change
of Plea." (Doc. 35, Ex. 132.) On December 9, 1998, Dr. Jack Potts, a forensic psychiatrist,
conducted the evaluation. (Doc. 35, Ex. 68.) Dr. Potts reviewed the court's minute entry
ordering the evaluation, a police report regarding the Reynolds murder, a copy of the
indictment, and Petitioner's Correctional Health Services medical records. (*Id.* at 1.)

According to Dr. Potts, Petitioner was "fully alert and oriented to his name, our
location, and the general reason for our interview." (*Id.* at 2.) Petitioner's thought processes
were "goal-directed and intact throughout" and there was "absolutely no evidence that he
was suffering from perceptual disturbances such as auditory or visual hallucinations during
the time of [the] evaluation." (*Id.*) Petitioner denied having any "special powers," his
memory was "grossly intact for both recent and remote events," his "cognitive abilities
appeared to be consistent with that of the general population, if not slightly above average,"
and "his abilities to abstract and conceptualize appeared to be grossly intact." (*Id.*)

Dr. Potts noted that Petitioner had "some beliefs that may be considered 'fringe.'"
(*Id.*) Petitioner described having "out of body experiences." (*Id.*) He claimed to have
knowledge of the Buddhist monk killings in Phoenix. (*Id.*) Petitioner also informed Dr.
Potts that he believed he was "being monitored through telephone wiretaps and surveillance."
(*Id.*) Petitioner was concerned that when he underwent leg surgery while incarcerated, "a
location transmitting device had been implanted in his skull"; he wanted to get a CT scan or
skull x-ray to confirm this suspicion. (*Id.*) Dr. Potts noted, however, that "when questioned

further, the defendant said these concerns and knowledge of surveillance activities" had "nothing to do with his taking a plea." (*Id.*)

Dr. Potts determined that Petitioner understood the charges against him, was aware of his constitutional rights, knew that the prosecution would be seeking the death penalty, and understood the ramifications of pleading guilty. (*Id.*) Petitioner maintained that he was "not desirous of putting his family or the alleged victim's families through the trauma of a trial." (*Id.* at 3.)

Dr. Potts opined that Petitioner would likely be found competent. (*Id.*) His "initial impression" was that Petitioner's "belief systems do not impact on his rational or factual understanding of the proceedings he is facing, his ability to effectively assist his attorney, or his understanding of waiving his rights by entering a plea." (*Id.*)

However, while noting that Petitioner had never evidenced "any major mental illness" to the court or to the attorneys, Dr. Potts explained that Petitioner had a long history of "abusing methamphetamine" and might suffer from "a paranoid delusional disorder secondary to his past use." (*Id.*) Therefore, Dr. Potts recommended that Petitioner's competency be evaluated further, out of concern that Petitioner's paranoia might impair his judgment and could prompt him to plead guilty whether or not doing so was in his best interest. (*Id.*)

On December 10, 1998, the trial court granted Petitioner's motion for a competency determination and transferred the case to a Commissioner for further Rule 11 proceedings. (Doc. 35, Ex. 133.) The court appointed Drs. John Scialli, a psychiatrist, and Scott Sindelar, a clinical psychologist, to examine Petitioner and evaluate his competency to stand trial or plead guilty. (*Id.*, Ex. 134.) The doctors were ordered to evaluate Petitioner's "present competency," including whether he was "able to understand the nature and object of the proceeding" and "able to assist in [his] defense." (*Id.*) They were also instructed to address "whether mental illness, defect or disability has substantially impaired [Petitioner's] ability to make a competent decision concerning a waiver of rights and to have a rational, as well

as factual understanding of the consequences of entering a plea of guilty," and whether Petitioner understood the constitutional rights he would give up by pleading guilty. (*Id.*)

Dr. Sindelar examined Petitioner on January 19, 1999. (Doc. 35, Ex. 69.) He determined that Petitioner was "competent to stand trial," "able to understand the nature of the proceedings against him," and "currently able to assist counsel in the preparation of his defense." (*Id.* at 1.) Dr. Sindelar noted that Petitioner had a "long history of multiple substance abuse," including intravenous injection of methamphetamine. (*Id.*) Nonetheless, Dr. Sindelar believed that Petitioner could make a competent decision concerning the waiver of his rights and that he had a "factual and a rational understanding of the consequences of pleading guilty." (*Id.* at 2.) Petitioner "appeared very knowledgeable about his alternatives and the reasons for his choices." (*Id.*) His "thought content was logical and connected except when he attempted to convince [Dr. Sindelar] that he might have an electronic device implanted in his skull"; according to Dr. Sindelar, this "content sounded delusional." (*Id.*) However, Dr. Sindelar did not believe this delusion affected Petitioner's competency or his "ability to help his attorney." (*Id.*)

Dr. Scialli examined Petitioner and also concluded that he was competent to stand trial and to plead guilty. (Doc. 35, Ex. 70 at 1.) Dr. Scialli interviewed Petitioner on January 12, 1999. (*Id.* at 1.) He reviewed police reports from Petitioner's offenses, medical records from Correctional Health Services, Dr. Potts' pre-screening report, and news stories regarding the charges against Petitioner. (*Id.* at 2.) Dr. Scialli noted that Petitioner had one prior "known psychiatric contact," an incident in 1978 when Petitioner was briefly hospitalized in Indiana while intoxicated with amphetamines. (*Id.*) In 1997, while incarcerated on the present charges, Petitioner had informed jail staff that he was depressed, suicidal, and had a sleep disorder. (*Id.*) No medication was prescribed at the time, but subsequently he was diagnosed with anxiety disorder and prescribed anti-anxiety medication. (*Id.*) Dr. Scialli indicated that he had spoken to Petitioner's ex-wife, who said that Petitioner "had been making comments about the CIA for around the year prior to his incarceration," and that Petitioner believed a

tracking device had been implanted in his leg. (*Id.* at 2.)

Dr. Scialli determined that Petitioner was "criminally competent to stand trial," explaining that Petitioner was able to "understand the nature of the proceedings against him" and "assist counsel in the preparation of his own defense." (*Id.* at 2-3.) Although Petitioner possessed the "fringe" beliefs noted by Dr. Potts, Dr. Scialli found "no evidence of illogical thoughts, delusions or hallucinations." (*Id.*) Dr. Scialli also found that Petitioner's beliefs did not interfere with his reasoning ability. (*Id.*)

According to Dr. Scialli, if Petitioner "chooses to plead guilty, mental illness has not substantially impaired [his] ability to make a competent decision concerning waiver of rights, and to have a rational, as well as factual, understanding of the consequences of pleading guilty." (*Id.*) Petitioner was aware of the details of his plea agreement, which he had discussed with counsel; he specifically acknowledged to Dr. Scialli that he would still "get the death penalty even with the plea deal." (*Id.*) Petitioner's motivation for accepting the plea deal was that "death row has a better quality of life" than that of the general prison population, and that he wanted to "spare others from the stress of a trial." (*Id.* at 4.) He also believed that the outcome would be the same whether he pled guilty or went to trial. (*Id.*) Dr. Scialli found "nothing illogical" about Petitioner's reasoning. (*Id.*) When Dr. Scialli explained "possible defense and/or mitigating factors" available in a trial, Petitioner indicated that he was "not previously aware of these things" but even with that information he would still choose to plead guilty. (*Id.*)

Finally, Dr. Scialli discussed Petitioner's desire to obtain an x-ray to identify the tracking device he believed was in his skull, and the possible effect of this desire on his decision to plead guilty. (*Id.*) Petitioner told Dr. Scialli that when he discussed the plea agreement with Lorona, Lorona told him he would get the x-ray if he signed the agreement. (*Id.*) Dr. Scialli found that Petitioner's discussion of the issue was "done in a logical way, notwithstanding no information from his attorney as to whether the skull x-ray had been discussed when discussing the plea agreement." (*Id.*) Dr. Scialli found that Petitioner's

beliefs about the implant did not "interfere[] with his ability to enter a plea of guilty" and concluded that "[w]hat was more convincing was that the defendant said that he would still enter a plea(s) of guilty even if getting an x-ray were not part of the deal." (*Id.*) Dr. Scialli also noted that Petitioner would "drop" the issue if he received an x-ray and it showed no evidence of an implant. (*Id.*) According to Dr. Scialli, "This sort of reasoning is not typical of a paranoid delusion." (*Id.*)

On January 26, 1999, the parties stipulated to a determination of Petitioner's competency based on Dr. Sindelar and Dr. Scialli's reports. RT 1/26/99 at 3-4; ROA 178.[5] The Commissioner found Petitioner competent to stand trial, concluding that he was "competent in assisting counsel in his own defense, and making rational decisions reference the handling of this matter." RT 1/26/99 at 4-5; ME 179. The Commissioner then remanded the case to the trial court for a status conference. RT 1/26/99 at 5-6; ME 179.

On February 1, 1999, the State filed a motion requesting that the court order Correctional Health Services to provide Petitioner with a skull x-ray. ROA 182. The prosecutor stated that the x-ray would "reassure [Petitioner] that no tracking device exists" and "alleviate any potential coercive allegations raised at any future plea proceedings." *Id.* at 2. The court granted the State's motion and ordered Correctional Health Services to perform a skull x-ray. RT 2/2/99 at 2-3.

On May 3, 1999, Lorona orally requested that Petitioner be sent back to Dr. Potts for an additional Rule 11 competency evaluation; the court granted the request. RT 5/3/99 at 3; ROA 191. Thereafter, the court granted a number of continuances for Dr. Potts to complete the evaluation. *See* RT 7/7/99 at 3-4; RT 8/11/99 at 3-4.

---

[5] "ROA" refers to the four-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-01-421-AP). "RT" refers to the court reporter's transcripts. "ME" refers to the minute entries of the state court. The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this court by the Arizona Supreme Court on July 15, 2009. (*See* Docs. 19, 24.) Pursuant to the court's order, Respondents filed additional records from the postconviction proceedings. (*See* Docs. 27, 31-34.)

Dr. Potts visited Petitioner again on August 19, 1999, eight months after his initial interview, and found that Petitioner "continues to present as he has."[6] (Doc. 35, Ex. 71 at 1.) Dr. Potts again opined that Petitioner was "very well aware of the charges he is facing" and "well aware that he has been offered a plea agreement wherein, on at least one of the cases he would be sentenced to life, and in the other case, he might receive the death penalty." (*Id.*) Dr. Potts noted that Petitioner continued to desire testing to "see if there is an implant in his brain." (*Id.*) Petitioner had already undergone a CT scan, which was "reported as negative," but, "as is not uncommon with paranoid individuals," Petitioner believed that the results might have been doctored and now wanted an MRI. (*Id.*)

Although Petitioner still believed he had a tracking device in his head, Dr. Potts stated that Petitioner did not "believe that the implant has anything to do with the legal proceedings he is facing." (*Id.* at 2.) Dr. Potts also noted that Petitioner continued to claim knowledge of the Buddhist temple murders but opined that those beliefs did not "impact on his offenses or the proceedings he is presently facing." (*Id.*)

Dr. Potts found that Petitioner was "continuing to experience paranoid beliefs and delusions secondary to his past amphetamine abuse," noting that it is not uncommon for such symptoms to persist "even for years after the cessation of amphetamines." (*Id.*) He reiterated that Petitioner's presentation was "consistent with delusions secondary to past chronic methamphetamine abuse." (*Id.* at 2.) Dr. Potts indicated, based on the information he had, that Petitioner had functioned "relatively well" before he became an addict. (*Id.*) He concluded that it was likely that Petitioner's methamphetamine use "greatly contributed to the alleged offenses having occurred." (*Id.*)

---

[6]     As discussed below, the record presented during the PCR proceedings indicates that on July 30, 1999, jail staff discovered that Petitioner had cut himself on his left wrist and elbow and on the top of both feet. (Doc. 35, Ex. 103 at 2.) He was escorted on his own power to the jail clinic where he received stitches. (*Id.*) After assuring staff that he would not harm himself further, he returned to his cell. (*Id.*) Petitioner stated that he was upset over the anniversary of his father's death. (*Id.*) Staff also found a "suicide note." (*Id.*)

Dr. Potts again determined that Petitioner fully appreciated the rights he would waive by pleading guilty and that Petitioner was "capable of weighing various options." (*Id.* at 3.) He noted that one of Petitioner's stated reasons for entering a guilty plea was to spare the victims' families additional suffering. (*Id.*) According to Dr. Potts, a more extensive competency evaluation was not warranted, because Petitioner's delusions were "relatively circumscribed" and seemed to have little if any bearing on the proceedings. (*Id.* at 2-3.)

On October 8, 1999, Lorona informed the trial court that Dr. Potts had again found Petitioner competent and did not recommend any further competency proceedings. The trial court denied the defense motion for a full competency evaluation. RT 10/8/99 at 3-4; ROA 196.

Petitioner's change of plea hearing occurred on January 10, 2000. The trial court questioned Petitioner to determine whether he understood the proceedings. RT 1/10/00 at 10-28. The court asked Petitioner about his age, education level, whether he had difficulty reading or understanding English, and whether he was taking any medications. *Id.* at 10. Petitioner informed the court that he had taken Klonopin for anxiety and Elavil for back pain. *Id.* at 11. He stated that the medications helped him to understand the proceedings and that he understood "everything very clearly." *Id.*

The court asked Petitioner if his attorney had discussed the plea agreement with him; Petitioner stated that he had. *Id.* at 11-12. The court then informed Petitioner of the charges against him and the potential sentence on each charge. *Id.* at 12-24. Petitioner stated that he understood all of the charges and possible sentences. *Id.* at 13-17. When asked if any promises or guarantees had been made to him in exchange for his pleas, Petitioner replied, "None at all." *Id.* at 15-16, 25. Petitioner expressed a desire that the court and the State avoid speaking to the media about the offenses, but indicated that he had received no guarantees from anyone regarding media coverage. *Id.* at 20.

The court asked Petitioner if he had signed each of the plea agreements because he "understood them and agreed with them." *Id.* at 26. Petitioner responded, "Yes, ma'am."

*Id.* When the court asked Petitioner if there was anything in the agreements that he did not understand, Petitioner replied, "No, ma'am." *Id.*

The court then informed Petitioner that he had a right to a separate jury trial in each of his cases, in which the "obligation would be on the state to prove [his] guilt to a jury beyond a reasonable doubt as to each count in each case." *Id.* at 27. Petitioner stated that he understood that right. *Id.* The court told Petitioner that if the case went to trial, the State would call witnesses and his attorney could cross-examine those witnesses and call witnesses on Petitioner's behalf. *Id.* at 27. The court informed Petitioner that he could choose whether or not to testify at trial and if he chose not to testify the jury could not use his silence against him. *Id.* Petitioner stated that he understood those rights. *Id.*

Petitioner pled guilty to kidnapping and first degree murder in the Eggert case and aggravated robbery, kidnapping, and first degree murder in the Reynolds case. *Id.* at 28-34. As the prosecutor described the factual bases of the charges, Petitioner occasionally interrupted to correct what he considered to be factual errors. *Id.* at 29-34. When the court questioned him regarding the factual bases of the charges, Petitioner again answered the questions clearly and offered corrections. *Id.* at 34-38. The trial court found that Petitioner's guilty pleas were knowing, intelligent, and voluntary. *Id.* at 42-43.

On appeal, during oral argument before the Arizona Supreme Court, Petitioner's appellate counsel asserted for the first time that Petitioner had been incompetent to plead guilty. *Murdaugh*, 209 Ariz. at 27, 97 P.3d at 852. Because Petitioner did not raise the claim in his opening brief, the court reviewed the claim only for fundamental error, concluded there was none, and found the claim waived. *Id.* The court explained:

> In this case, the trial judge found that Murdaugh was competent to plead guilty and that there was a sufficient factual basis to support the plea. The judge questioned Murdaugh directly about his agreement with the State, and Murdaugh responded that he understood both the nature and the consequences of his plea. He also told the judge that he was not under the influence of alcohol at the time of the plea and that the drugs he was taking to control anxiety and back pain did not impair his ability to understand the plea proceedings. In addition, Murdaugh stated that his attorney had gone over all

the terms of the plea agreement with him and that he fully understood the implications of the plea.

The trial judge did not inquire further into whether Murdaugh was mentally competent to enter the plea agreement. A year before the plea proceedings, however, Drs. Sindelar and Scialli had evaluated Murdaugh's competency to stand trial. Relying on the reports prepared by these doctors, the court had found Murdaugh competent to stand trial. Dr. Potts re-evaluated Murdaugh approximately four months before he entered into his plea agreements. Murdaugh's counsel informed the court that Dr. Potts did not recommend any further competency evaluation. From this we can infer that Dr. Potts found Murdaugh competent to understand the proceedings and assist in his defense. Finally, neither Murdaugh nor his trial counsel raised any claim, either during the change of plea or during the sentencing hearing, that Murdaugh may have been incompetent to plead guilty.

Viewing this evidence in the light most favorable to sustaining the trial court's decision, reasonable evidence supports the trial court's finding that Murdaugh was competent to enter a plea of guilty and that he entered the plea knowingly, intelligently, and voluntarily.

*Id.*

### (1)   Claim 8

Petitioner alleges that trial counsel performed ineffectively by failing to ensure that his guilty pleas were knowing, intelligent, and voluntary and by inducing him to plead guilty by making promises based on his delusions. (Doc. 35 at 168.) Respondents concede this claim is exhausted.

Clearly established federal law

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687-88.

The inquiry under *Strickland* is highly deferential and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 130 S. Ct. 383, 384 (2009) (per curiam); *Bobby v. Van Hook*, 130 S. Ct. 13, 16 (2009) (per curiam). Thus, to satisfy *Strickland*'s first prong, a defendant

must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687-88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Therefore, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

Under the AEDPA, this Court's review of the state court's rulings on Petitioner's ineffective assistance claims is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under the AEDPA). Therefore, to prevail on this claim, Petitioner must make the additional showing that the PCR court, in ruling that trial counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. 28 U.S.C. § 2254(d)(1).

Analysis

Petitioner sets forth a number of specific challenges to Lorona's performance. He alleges that counsel spent insufficient time working on the case, did not visit him regularly in jail, and did not consult with him. (Doc. 35 at 170-71, 175-76.) He contends that his "paranoid and disturbed" behavior should have alerted Lorona to "possible mental health and

competency issues." (*Id.* at 70.) He argues that Lorona failed to provide defense experts with information regarding his interactions with Petitioner. (*Id.* at 171.) He claims that Lorona did not personally review the plea agreement with him. (*Id.* at 181.) Finally, he asserts that Lorona induced him to plead guilty by promising that he would receive a head x-ray. (*Id.* at 181.)

The PCR court rejected these allegations of ineffective assistance, finding that Petitioner's guilty plea was knowing and voluntary and noting that Petitioner appeared coherent and rational in his interactions with the trial court and assured the court that he "understood the proceedings as well as the consequences." (Doc. 31, Ex. 93 at 17.) This ruling was neither contrary to nor an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts. Petitioner's allegations, some of which are contrary to the record, are insufficient to establish that Lorona performed at a constitutionally ineffective level with respect to Petitioner's guilty pleas.

First, far from ignoring signs that Petitioner had mental health issues, Lorona secured examinations from three experts, all of whom found Petitioner competent to plead guilty. The court rejects Petitioner's assertion that Lorona performed ineffectively by failing to argue that Petitioner was incompetent to enter a plea. Drs. Potts, Scialli, and Sindelar examined Petitioner and "provided detailed, reasoned reports which contained their individual opinions that [he] was competent." *Moran v. Godinez,* 57 F.3d 690, 699-700 (9th Cir. 1994). Because Lorona was "entitled to rely on these reports," it was unnecessary for him to investigate the issue further. *Id.* at 700.

In *Taylor v. Horn*, 504 F.3d 416, 438-39 (3d Cir. 2007), the Third Circuit held that the petitioner could show neither deficient performance nor prejudice based on counsel's failure to request a competency examination. Prior to his guilty plea, the petitioner had been found competent by two experts. *Id.* at 421. The court determined that "counsel's interactions with Taylor – paired with both the . . . reports concluding that Taylor was competent – were sufficient for counsel to reasonably forego a competency hearing." *Id.* at 438. In addition,

because there was no reasonable probability that the petitioner was incompetent, counsel's failure to request a competency hearing was not prejudicial. *Id.* at 439. Similarly, in Petitioner's case, there were "sufficient indicia of competence," *id.* at 438, such that Lorona's failure to pursue an argument that Petitioner was incompetent to plead guilty did not constitute deficient performance and did not result in prejudice.

Also unavailing is Petitioner's assertion that Lorona failed to provide the Rule 11 experts with records necessary for their evaluations. Although Dr. Potts stated in his pre-screening competency report that he did not receive any information from the defense, investigator Jeff Bachtle recalled delivering documents about Petitioner's background to Dr. Potts. RT 4/29/08 at 42-43. At the evidentiary hearing before the PCR court on Petitioner's claims of ineffective assistance of counsel, Dr. Potts testified that he spoke with Lorona concerning the pre-screening evaluation but could not remember if they had further contact, nor could he recall if Bachtle had provided him with additional records. RT 5/14/08 at 37-41. Dr. Scialli testified that while he received no materials from defense counsel, he had enough information before him to make a determination. RT 4/28/08 at 30-31. Neither Dr. Potts nor Dr. Scialli suggested that their evaluations were compromised due to a lack of documentary evidence.

Next, Petitioner fails to show that Lorona performed ineffectively with respect to Petitioner's desire for a head x-ray. Petitioner himself indicated to Drs. Potts and Scialli that an x-ray was not a necessary condition of his guilty plea. (Doc. 35, Ex's. 68, 70.) In addition, prior to pleading guilty Petitioner received an x-ray at the State's request. *See* ROA 182; ME 181. Therefore, Lorona's promise of an x-ray did not serve as an inducement for Petitioner's plea.

Petitioner's complaints about counsel's lack of effort and infrequent jail visits are not sufficient to establish ineffective assistance of counsel. Although Lorona only visited Petitioner in jail five or six times over the course of his representation, he spoke to Petitioner on the phone two to three times every week and discussed the case with Petitioner during

court appearances. RT 4/29/08 at 108-10, 129-30. In addition, defense investigator Bachtle visited Petitioner in jail more than 20 times and spoke with him on the phone several times a week. *Id.* at 43-45. The mitigation specialists also had contact with Petitioner in jail. *See* RT 4/28/08 at 39; RT 4/30/08 at 129.

Even if Lorona's infrequent jail visits constituted deficient performance, "the mere fact that counsel spent little time with [petitioner] is not enough under *Strickland*, without evidence of prejudice or other defects." *Bowling v. Parker*, 344 F.3d 487, 506 (6th Cir. 2003). While Petitioner alleges generally that Lorona had a duty to engage in more frequent personal contact with him, he has provided "no explanation how additional meetings with his counsel, or longer meetings with his counsel, would have led to new or better theories of advocacy or otherwise would have created a 'reasonable probability' of a different outcome." *Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005); *see Lenz v. Washington*, 444 F.3d 295, 302-03 (4th Cir. 2006).

Petitioner argues that the numerous delays in the proceedings reflect the extent of Lorona's other commitments and his lack of focus on Petitioner's case. However, the record indicates that Lorona requested continuances primarily to prepare for trial, because discovery was not complete, because the parties were attempting to settle the case, or because reports from the defense experts were not yet available. *See* RT 9/17/97, 4/6/98, 4/1/99, 6/7/99, 8/11/99, 10/24/00. Other continuances were requested by the State. *See* RT 2/19/98, 6/16/98, 12/10/99. Moreover, it was Petitioner's express desire that Lorona "stretch out" the case for "as long as possible." (Doc. 35, Ex. 44; *see id.*, Ex. 6.)

Likewise, Petitioner's contention that Lorona did not discuss the plea agreement with him are not well-founded. During the PCR evidentiary hearing, Bachtle testified that Lorona, who had already reviewed the plea agreement with Petitioner, requested that he go to the jail and again discuss the agreement with Petitioner. RT 4/29/08 at 65-66; *see* Doc. 35, Ex. 76. Lorona testified that either he or co-counsel went to the jail to review the plea agreement with Petitioner. *Id.* at 150-51. Lorona also discussed the agreement with Petitioner while

they were together in court. *Id.* Moreover, after being presented with the plea agreement, Petitioner wrote Lorona a letter discussing changes he would like made and concluding, "Get these matters taken care of and I will then sign the plea deals to avoid the trauma of trials on my own and the victim's families." (Doc. 35, Ex. 47.) Such statements are inconsistent with the assertion that Petitioner was unfamiliar with the terms of the plea agreement.

It is clear that from an early point in the case Petitioner expressed a desire to plead guilty in order to spare his and the victims' families the ordeal of a trial. For example, on April 18, 1996, Bachtle wrote a memo to Lorona noting that "Petitioner stated that he does NOT want to go to trial regarding his murder charges. He does NOT want to bring the victims family or his own family into court to listen to the allegations pertaining to the victim's death." (*Id.*, Ex. 18.)

The Ninth Circuit recently reiterated that "prejudice does not generally exist when a defendant chooses to plead guilty." *Smith v. Mahoney*, 596 F.3d 1133, 1146 (9th Cir. 2010) (citing *Lambert v. Blodgett,* 393 F.3d 943, 980 (9th Cir. 2004); *Langford v. Day*, 110 F.3d 1380, 1383-84 (9th Cir. 1996)). Petitioner, like the defendants in *Langford* and *Smith*, "strongly and repeatedly insisted on pleading guilty and seeking the death penalty." *Langford*, 110 F.3d at 1386. He was "determined and unequivocal in his decision to plead guilty," *id.* at 1388, consistently citing as the reason for his plea a desire to spare the families the trauma of a trial. As the court stated in *Smith*, "In such cases, where 'the defendant has his own reasons for pleading guilty,' relief is not warranted." 596 F.3d at 1147 (quoting *McMann v. Richardson*, 397 U.S. 759, 767 (1970)).

Conclusion

Petitioner wanted to plead guilty, and the uncontradicted opinions of the mental health experts indicated that he was competent to do so. Lorona's performance was neither deficient nor prejudicial. Therefore, the PCR court's rejection of this claim was not objectively unreasonable and Petitioner is not entitled to relief. Claim 8 is denied.

**(2)    Claims 9, 10, and 11**

In Claim 9, Petitioner alleges that his guilty pleas were not knowing, intelligent, or voluntary because they were the product of his paranoid beliefs, safety fears, and promises by counsel. (Doc. 35 at 184.) In Claim 10, he alleges that the trial court erred when it failed to conduct an adequate competency determination to ensure that he was competent to plead guilty. (*Id.* at 190.) In Claim 11, Petitioner asserts that he was incompetent to plead guilty, resulting in a waiver of his right to trial that was not knowing, intelligent, and voluntary. (*Id.* at 198.) Petitioner also alleges that appellate counsel was ineffective in failing to properly raise the issue of Petitioner's competency to plead guilty. (*Id.*)

Procedural status

Respondents assert that these claims are procedurally barred. With respect to Claim 9, Respondents contend that Petitioner failed to present the federal basis of the claim to the Arizona Supreme Court in his petition for review and therefore the claim is unexhausted. (Doc. 38 at 144.)

Petitioner raised Claim 9 in his PCR petition, alleging violations of the Eighth and Fourteenth Amendments and citing *Boykin v. Alabama*, 395 U.S. 238 (1969). (Doc. 31, Ex. 39 at 7, 19.) The PCR court rejected the claim:

> Defendant next claims that his plea of guilty and decision to waive mitigation was involuntary because it was the product of false promises and threats.
>
> In the colloquy for his change of plea, defendant told the trial court that there were no other promises made to him, and that his decision to plead guilty was not the result of any threat. Defendant specifically advised the trial court that his decision was voluntarily made.
>
> As stated previously, the trial court carefully questioned defendant about his awareness of the content of mitigation and his right to present it, and determined that his decision to waive mitigation was knowingly and voluntarily made.
>
> IT IS ORDERED dismissing defendant's fourth claim summarily pursuant to Rule 32.6(c).

(Doc.32, Ex. 98 at 5.)

In his petition for review, Petitioner argued that his "guilty plea was invalid because he was mentally incompetent, because the plea was not knowing, intelligent and voluntary, because there was an inadequate determination of his competence to waive fundamental constitutional rights (*see supra*, Claim 2), and because improper promises were made to Murdaugh by Lorona in order to induce him to plead guilty." PR at 28. Petitioner argues that his reference to Claim 2, which challenged his competence to waive mitigation and cited the federal constitution and case law, was sufficient to present the federal basis of this claim. (Doc. 41 at 68.) The court agrees that Petitioner fairly presented the federal basis of the claim to the state court, and will consider Claim 9 on its merits.

Respondents also contend that Claim 10 is precluded and procedurally barred. (Doc. 38 at 148.) The court again disagrees.

In his PCR petition, Petitioner for the first time raised the claim that the trial court erroneously failed to conduct a competency determination. (Doc. 31, Ex. 39 at 2-4, 15-16.) The PCR court found the claim precluded under Rule 32.2(a)(1), (2), and (3) because it "was raised, or could have been raised on appeal." (Doc. 32, Ex. 98 at 4.) The court alternatively held:

> [T]here was no need for further competence determination. The record is devoid of any evidence suggesting defendant's decision to plead guilty was based on anything other than his expressed desire to spare the victim's family and his family from a trial. Dr. Scialli and Dr. Sindelar specifically stated in their reports that defendant was able to assist counsel in preparation of a defense.
>
> It is clear from the colloquy at the change-of-plea hearing, and from the mental health evaluations, that defendant understood the nature of the proceedings against him, that he was able to assist counsel, and that he understood the constitutional rights he would be giving up by pleading guilty. This claim, thus, fails to state a colorable claim for relief, and is summarily dismissed pursuant to Rule 32.6(c).

(*Id.*)

The PCR court's procedural ruling, that the claim was raised or could have been raised, is ambiguous. It fails to distinguish a claim previously raised, which is exhausted, from a claim waived because it was not raised previously. The ruling, therefore, does not

function as an adequate bar to federal review. *See Valerio v. Crawford*, 306 F.3d 742, 774-75 (9th Cir. 2002) (en banc); *Koerner v. Grigas*, 328 F.3d 1039, 1049-50 (9th Cir. 2003); *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996). The court will consider Claim 10 on its merits.

Finally, Respondents contend that Claim 11, challenging Petitioner's competence to plead guilty, is procedurally barred. (Doc. 38 at 154-55.) Here, the court agrees.

Petitioner raised this claim during oral argument before the Arizona Supreme Court. The court, finding no fundamental error, deemed the claim waived. *Murdaugh*, 209 Ariz. at 26, 97 P.3d at 851. Petitioner raised the claim again in his PCR petition. (Doc. 31, Ex. 39 at 6-7.) The PCR court found it precluded under Rule 32.2(a)(1) and (3) because it could have been raised on direct appeal.[7] (Doc. 32, Ex. 98 at 4-5.)

This preclusion ruling rests on an independent and adequate state procedural bar. *See Smith*, 536 U.S. at 860; *Ortiz*, 149 F.3d at 931-32. Therefore, Claim 11 is procedurally barred, absent a showing of cause and prejudice or a fundamental miscarriage of justice.

Petitioner alleges ineffective assistance of appellate counsel as cause for his default of the claim. (Doc. 41 at 81.) While properly exhausted in state court, the allegation that appellate counsel was ineffective is itself meritless because, for the reasons set forth below, Petitioner cannot show that he was prejudiced by appellate counsel's handling of the competence issue. Therefore, Petitioner's default of this claim is not excused by appellate counsel's performance. *Carrier*, 477 U.S. at 492 ("Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default"). Nor has Petitioner established that a fundamental miscarriage of justice would result from the court's failure to consider Claim 11 on the merits. *See Schlup*, 513 U.S. at 327.

---

[7] The court alternatively denied the claim as not colorable for the reasons set forth in Claim 10 above. (Doc. 32, Ex. 98 at 5.) The fact that the PCR court alternatively discussed the merits of the claim does not affect the application of Rule 32.2(a)(3) because the court "explicitly invoke[d] a state procedural bar as a separate basis for decision." *Harris*, 489 U.S. at 264 n.10.

<u>Clearly established federal law</u>

Due process requires that a defendant be competent to plead guilty. *Pate v. Robinson*, 383 U.S. 375, 384-85. The standard for competence to plead guilty is the same as the standard for competence to stand trial. *Godinez v. Moran*, 509 U.S. 389, 396, 399-401 (1993). The defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," together with "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam); *see Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985).

Due process also requires a court to conduct a competency hearing on its own motion when "a reasonable judge would be expected to have a *bona fide* doubt as to the defendant's competence." *Moran*, 57 F.3d at 695; *see Amaya-Ruiz v. Stewart*, 121 F.3d 486, 489 (9th Cir. 1997). A bona fide doubt exists if there is "substantial evidence of incompetence." *Id.* "Although no particular facts signal incompetence, suggestive evidence includes a defendant's demeanor before the trial court, previous irrational behavior, and available medical evaluations." *Id.* A state court's competency determination is entitled to a presumption of correctness on federal habeas review and may be overturned only if it is not "fairly supported by the record."[8] *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990) (per curiam); *see Franklin v. Luebbers*, 494 F.3d 744, 750 (8th Cir. 2007); *Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 891-92 (9th Cir. 2004). In reviewing whether a state trial judge was required to conduct a competency hearing, a habeas court may consider only the evidence that was before the judge. *See McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008) (citing *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir. 2004)).

For a guilty plea to be valid, the defendant must not only be competent, but the plea must be "knowing and voluntary." *Godinez v. Moran*, 509 U.S. at 400; *see Brady v. United States*, 397 U.S. 742, 748 (1970). The plea must "represent[] a voluntary and intelligent

---

[8] As Respondents note, there is no support for Petitioner's argument that this court must make an "independent decision on the question of competence" (Doc. 35 at 204).

choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). A plea is voluntary when a defendant is informed of and waives his privilege against self-incrimination, his right to trial by jury, and his right to confront witnesses. *Boykin*, 395 U.S. at 243. A plea is coerced and void if it was "induced by promises or threats which deprive it of the character of a voluntary act." *Machibroda v. United States*, 368 U.S. 487, 493 (1962); *see Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007).

A habeas petitioner bears the burden of establishing that his guilty plea was not voluntary and knowing. *See Parke v. Raley*, 506 U.S. 20, 31-34 (1992); *Little v. Crawford*, 449 F.3d 1075, 1080 (9th Cir. 2006); *Miles v. Dorsey*, 61 F.3d 1459, 1472 (10th Cir. 1995). Findings by the judge accepting the plea "constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Alison*, 431 U.S. 63, 74 (1977); *see Doe v. Woodford*, 508 F.3d at 571-72.

Analysis

1. *Competence*

Petitioner argues that he was not competent to plead guilty and that appellate counsel performed ineffectively by failing to properly raise the issue (Claim 11), and that the trial court failed to make an adequate competency determination (Claim 10). The record does not support these claims.

The Ninth Circuit has noted that "[i]n cases finding sufficient evidence of incompetency, the petitioners have been able to show either extremely erratic or irrational behavior during the course of trial . . . or lengthy histories of acute psychosis and psychiatric treatment." *Boag*, 769 F.2d at 1344; *see Drope v. Missouri*, 420 U.S. 162, 180 (1975). Petitioner has made neither showing.

In *Boag*, evidence of the petitioner's mental condition included five suicide attempts, repeated head injuries, bizarre behavior, alcoholism, the report of a prison psychiatrist made

four months before trial that the petitioner had sociopathic personality disturbance and anti-social reaction, and a state judge's comment made six months before trial that the petitioner needed intensive psychiatric treatment. 769 F.2d at 1343. The Ninth Circuit found that "these facts, taken as a whole, do not raise a substantial doubt as to Boag's competency" such that the trial court was required to order a competency hearing. *Id.*

In *Amaya-Ruiz*, the Ninth Circuit rejected the petitioner's claim that the trial court erroneously failed to determine that he was incompetent. 121 F.3d 486. Amaya-Ruiz had been evaluated by two mental health professionals and found competent to stand trial. *Id.* at 489. Subsequently, he appeared to exhibit a lack of understanding of the legal proceedings and engaged in irrational behavior, including speaking in a loud voice at inappropriate times during the proceedings and acting in a disruptive manner at sentencing. *Id.* at 489-90. He also had attempted suicide, and records indicated that he was "prone to deep depression" and was taking medication. *Id.* at 492. The trial court refused to order an additional competency examination, and sentenced the defendant to death. *Id.* at 491-92.

The Ninth Circuit affirmed, explaining that "[t]hese events were insufficient to cause the state trial court to have a bona fide doubt as to Amaya-Ruiz's competency." *Id.* at 491. The court noted that the "state trial court previously had ordered two evaluations and the doctors opined Amaya-Ruiz was competent to stand trial. The evaluations suggested Amaya-Ruiz was malingering and had chosen a strategy of noncooperation. . . . Further, while his behavior may not have been rational at times, his behavior was not so extreme as to require an additional evaluation." *Id.* The Ninth Circuit also rejected the argument that a competency evaluation was required when the trial court discovered that the petitioner had been taking psychiatric medication. *Id.* at 493. The court noted that the trial judge, in making his determination that another evaluation was unnecessary, "had observed Amaya-Ruiz throughout the pretrial and trial proceedings" and "also had the benefit of two evaluations which indicated Amaya-Ruiz was a competent malingerer." *Id.*

By contrast, in *McMurtrey* the Ninth Circuit held that the petitioner's due process

- 33 -

rights were violated by the trial court's failure to hold a hearing because there was sufficient evidence to raise a bona fide doubt concerning his competence to stand trial. 539 F.3d at 1127. Defense experts noted that the McMurtrey had a history of head injuries and psychological problems, had a "spotty memory" which could impede his ability to assist counsel, and was subject to seizures and hallucinations. *Id.* at 1119. Prior to trial McMurtrey was moved to a psychiatric hospital due to suicidal ideation and a psychotic breakdown; a defense psychiatrist opined that he was incompetent to stand trial due to anxiety and memory problems. *Id.* at 1121. However, the state's psychological expert concluded that McMurtrey was competent to stand trial, basing his opinion on an hour-long interview. *Id.* at 1121-22. While incarcerated McMurtrey received high doses of a variety of antipsychotic and anti-anxiety medications; as a result he repeatedly became physically ill during the trial. *Id.* at 1122-23. The record also showed that he exhibited erratic and volatile behavior in jail, and at sentencing he responded irrationally to the judge's questions. *Id.* at 1124-45.

Similarly, in *Maxwell v. Roe*, 606 F.3d 561, 568-69 (9th Cir. 2010), the petitioner was unable to control his behavior in jail or in court. He was involuntarily committed several times before and during trial. *Id.* at 569-74. His treating doctors described him as "actively psychotic" and "unable to function." *Id.* at 573. The trial judge was aware that Maxwell had a history of mental illness and was being treated with a "panoply" of antipsychotic drugs at the time of trial, which took place largely in his absence. *Id.* at 570-71. Finally, there was "substantial evidence that Maxwell's mental condition had significantly deteriorated since the initial pretrial competency examination." *Id.* at 575. The Ninth Circuit held that the failure to order a competency hearing violated due process, and the state appellate court made an unreasonable factual determination in finding that the petitioner was not entitled to such a hearing. *Id.* at 576. *See also Torres v. Prunty*, 223 F.3d 1103, 1109-10 (9th Cir. 2000) (holding that a competency hearing was required where defendant believed his attorney was part of a conspiracy against him, threatened to assault his attorney, insisted on being handcuffed, and continually disrupted the trial until he was removed from the courtroom).

In Petitioner's case, the trial court could not have been expected to have a bona fide doubt about his competence to plead guilty. First, as recounted above, three court-appointed experts evaluated Petitioner and concluded that he was competent to stand trial and plead guilty. While noting Petitioner's fringe beliefs, they each found that he was not otherwise delusional, was able to think rationally, and comprehended his legal situation and options. There was no evidence that Petitioner's condition had deteriorated by the time of his guilty pleas. Furthermore, unlike the petitioners in *Amaya-Ruiz* and *McMurtrey*, Petitioner's conduct before the judge was never irrational or inappropriate. Judge Hutt observed Petitioner's courtroom demeanor on a number of occasions and heard his cogent answers during the plea colloquy.

Finally, the record revealed only one previous hospitalization for Petitioner. This occurred in 1978 when Petitioner was temporarily deemed incompetent after "a transitory psychotic episode influenced by drug ingestion, most likely amphetamines." (Doc. 35, Ex. 83.) He was subsequently found competent, with "no serious emotional distress," "unimpaired" reality testing, logic, and memory, "no indications of systematic delusions" or "hallucinatory experiences," and "no evidence of an active psychosis." (*Id.*)

Under these circumstances, the trial court was not required to conduct a more thorough competency determination before accepting Petitioner's guilty pleas. Therefore, Claim 10 is without merit.

Petitioner likewise fails to meet his burden with respect to his claim that he was incompetent when he entered his plea. The record reflects that the state court's competency determination was reasonable and fairly supported by the record, including the Rule 11 reports and the trial judge's personal observations of Petitioner. Petitioner has failed to rebut that determination by clear and convincing evidence. Therefore, his claim that he was not competent to plead guilty must fail. *See Demosthenes v. Baal*, 495 U.S. at 735; *Dennis ex rel. Butko v. Budge*, 378 F.3d at 891-92; *Hunter v. Bowersox*, 172 F.3d 1016, 1021 (8th Cir. 1999).

Because the claim that Petitioner was not competent lacks merit, appellate counsel's failure to raise the issue in his opening brief did not prejudice Petitioner and cannot constitute ineffective assistance. This conclusion is also supported by the Arizona Supreme Court's discussion of Petitioner's competence and the trial court's handling of the issue. *Murdaugh*, 209 Ariz. at 27, 97 P.3d at 852. Claim 11 is without merit.

### 2. *Knowing, intelligent, and voluntary*

Petitioner argues that his mental problems and promises made by counsel rendered his guilty pleas involuntary (Claim 9). Again, the record does not support this claim.

There has never been any evidence that Petitioner lacked the requisite rational and factual understanding of the proceedings.[9] Three experts opined that Petitioner, notwithstanding his fringe beliefs, was competent to plead guilty. Petitioner's plea colloquy, described above, further supports the conclusion that his plea was knowing and voluntary. Petitioner informed the trial court that he understood the plea agreements and was aware of the rights he was waiving, that no promises or threats had been made, and that there was a factual basis for his guilty pleas. RT 1/10/00 at 11-27. Petitioner's declaration that his plea was knowing and voluntary carries "a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. at 74. In addition, as recounted above, there were no false promises regarding a head x-ray, and he did not insist on an x-ray as a condition of his pleas. Instead, the record shows that Petitioner was motivated to plead guilty by his desire to avoid a trial that would traumatize his and the victims' families.

---

[9] Petitioner attached to his motion for evidentiary development a "psychological summary" prepared in 2009 by Dr. Robert Smith. (Doc. 51, Ex. 2.) Dr. Smith concluded that Petitioner "is of at least average intelligence and has a full comprehension of the legal process." (*Id.* at 2.) While stating that additional time was required to complete a "psychosocial history, diagnostic workup and full mental health examination," Dr. Smith's "diagnostic impressions" of Petitioner included delusional disorder, substance dependence, and narcissistic traits. (*Id.* at 10-11.) He also opined that trial counsel should have obtained an additional mental health evaluation upon Petitioner's decision to waive mitigation. (*Id.* at 10.)

Petitioner's case parallels the issues addressed in *Hunter v. Bowersox*, 172 F.3d 1016 (8th Cir. 1999). There, the petitioner pled guilty to two counts of first degree murder. The trial court found that the plea was knowing, intelligent, and voluntary. *Id.* at 1018. Court-ordered mental health evaluations, performed both before and after the plea hearing, found the petitioner competent, concluding that he "functioned at bright-average intelligence, understood the charges against him and the options available to him, was capable of entering a voluntary and intelligent plea, and had chosen to plead guilty because he wished to take responsibility for his participation in the crime and did not want to spend the rest of his life in prison." *Id.* at 1021. The petitioner subsequently moved to withdraw his plea, arguing that the effects of cocaine withdrawal and the conditions under which he was held in administrative segregation rendered him incapable of entering a knowing and voluntary plea. *Id.* at 1022. The trial court denied relief, as did the post-conviction court, the state supreme court, and the federal district court on habeas review. *Id.* at 1018-22. The Eighth Circuit affirmed, explaining that "the state courts' findings are entitled to the presumption of correctness, and that these findings fully support the determination that Hunter's plea of guilty was voluntary, knowing, and intelligent." *Id.* at 1022. In particular, the court noted that the petitioner's plea colloquy belied any claim that his cocaine addiction or the conditions of his confinement caused him to plead guilty. *Id.* at 1022-23.

Similarly, in Petitioner's case, the record fully supports the state courts' determination that Petitioner's guilty pleas were knowing and voluntary. Petitioner is unable to rebut the presumption that the this determination was correct.

Conclusion

Petitioner was competent to plead guilty. His pleas were knowing and voluntary. The decisions of the state court rejecting these claims were based on reasonable factual determinations and the reasonable application of federal law. Claims 9, 10, and 11 are therefore denied.

**B.      Mitigation Waiver: Claims 4-7**

Petitioner contends that his mental health issues rendered him incompetent to waive the presentation of mitigation evidence, that defense counsel performed ineffectively in handling the issue of Petitioner's competence and by failing to present mitigating evidence at sentencing, and that the trial court failed to make an adequate competency determination before accepting the waiver.

**(1)      Sentencing proceedings**

In preparation for sentencing, Lorona retained an addictionologist, Dr. Charles Shaw, and a psychiatrist, Dr. James Deming, to examine Petitioner for mitigation purposes.  Dr. Shaw met with Petitioner for four and a half hours on December 12, 2000, discussing Petitioner's history of substance abuse as well as his family background and the details of the murders.  (Doc. 35, Ex. 73 at 1.)  Dr. Shaw opined that "Petitioner had the signs and symptoms of paranoid schizophrenia along with a substance induced mood disorder." (*Id.*) He concluded:  "I strongly recommend that [Petitioner] have a psychiatric evaluation.  I believe he will be found schizophrenic and needs appropriate treatment." (*Id.* at 2.)

Dr. Deming conducted a 12-hour personal interview of Petitioner, reviewed numerous documents, including Petitioner's medical records, and prepared a lengthy report dated August 27, 2001.  (Doc. 35, Ex. 74.)  Dr. Deming diagnosed Petitioner with delusional disorder of a mixed type with grandiose, jealous, and persecutory features; a history of polysubstance abuse and dependence which may have created a permanent organic brain syndrome; and post-concussion syndrome resulting from numerous severe head injuries beginning at age 17.  (*Id.* at 9.)  Dr. Deming's report included detailed discussions of Petitioner's family background, drug use, and medical history, and emphasized the role Petitioner's paranoia and delusions played in the murders.  (*Id.* at 12-14.)

Petitioner initially indicated that he did not wish to present mitigating evidence.  He changed his mind briefly before finally deciding that he would waive mitigation.  Before his final decision, Petitioner told defense investigator Bachtle that he believed Dr. Potts would

testify on his behalf for mitigation purposes, to the effect that at the time of the murders Petitioner could not control his actions because of his addiction to methamphetamine. (Doc. 35, Ex. 42.) On November 22, 2000, Petitioner wrote to Lorona requesting that he "[g]et my Rolodex from property siezed [sic] by deputies from my house. Need to have it to give Lisa [Christianson, the mitigation specialist] a more complete and accurate list of people to contact on my behalf. Has names and phone numbers of people I know are not listed in any directories." (Doc. 35, Ex. 44.) Petitioner also asked Lorona to look into hiring a neuropsychologist, because another death row inmate had undergone neuropsychological testing to explain his outbursts of "sudden violence." (*Id.*)

In addition, Petitioner requested that Lorona obtain a "complete list of all states that have an interstate compact with Arizona." (*Id.*) Petitioner reasoned:

> If we pull this off and I do get natural life, then I want you to request a court order for a D.O.C. transfer out of Arizona. I do not want to spend 5 to 7 years in SMU 1 or 2, as this is where I will be sent upon transfer from here to D.O.C. Because my crimes will give me a 5-5 score going in. Being out of State will also allow my sons to get on with their lives much easier.

(*Id.*)

Petitioner also discussed the fact that Lorona rarely visited him in jail, adding:

> Anyway, what I'm getting at here is this: we both knew going in that this was a loser because of witnesses, and I know you have done as I've asked in trying to stretch it out as long as possible. I don't want to do anything to tarnish your name or abilities in any way. But if I tell the Judge of the sparse visits would somehow help my mitigation [sic], I think we should discuss this face to face. It's well known around the courthouse that you don't visit clients in this jail very often. This was told to me by a deputy that's been there for 35 years, I'm sure you know "Cookie," Roy Cook, he's the one who said you're a good attorney, "but have a bad rap when it comes to visits." I still want you to keep putting off the sentencing date as long as is possible.
>
> What ya need to do is set aside some time to come down here and talk to me. Things have changed in my life and we need to kick Mary Barry's ass on mitigation. I'm going to have Lisa try to get people to write letters on my behalf to present to the Judge as to my character before Becky and meth took over my life. So please come down here. Maybe we can pull it off.

(*Id.*)

In a another letter, Petitioner further detailed his desire to serve a natural life sentence out of state:

- 39 -

> I need info on interstate compacts so if by some miracle Lisa can get me life I don't want to do it here. I've had 43 years of this heat and that's enough for me. I want to go North, Idaho, Wyoming, Montana, Colorado, Nevada. Not Utah or Oregon, they're as bad as here from what I've learned. Anyway get back to me. I think about you every time I get one of these Snoopy the Lawyer toons.

(Doc. 35, Ex. 46.)

In late August and early September 2001, Petitioner decided that he did not want to present mitigating evidence, and directed Lorona not to provide copies of Lisa Christianson's mitigation report or Dr. Deming's evaluation to the prosecution. ROA 235, Ex. 1.

At a status conference on September 7, 2001, Lorona informed the court that Petitioner believed his life was in danger in jail and feared that a life sentence would be the equivalent of the death penalty for him because of the difficulties he had with other inmates. RT 9/7/01 at 4. Petitioner had urged Lorona to ask the prosecution to allow him to serve his time out of state. *Id.* at 4-5. Lorona had discussed this with the prosecutor, who refused the request. *Id.* The court subsequently confirmed that it did not have the power to order the Department of Corrections to place Petitioner out of state. *Id.* at 5-6.

Lorona told the court that, given these circumstances, Petitioner did not want the defense team to "put on any mitigation at all." *Id.* at 6. Lorona noted that he had obtained complete reports from Drs. Deming and Shaw and a report from his mitigation specialist, but Petitioner did not want these offered as evidence or filed in the record. *Id.*; *see* Doc. 35, Ex. 75; *see also* ROA 235, Ex. 1; ROA 239. Lorona explained that if the court could not guarantee Petitioner an out-of-state sentence, he wanted the death penalty so that he could be placed on death row. *Id.* at 6-7.

The trial court informed Petitioner that if he did not present mitigation evidence, the court would "order the State to give me what they have," and would "seek it from any source that is legitimately available to the Court and require the State to provide it." *Id.* at 8. The prosecutor stated that he would "willingly, whether the court orders me or not, turn over all information that I have that appears to me to be mitigating on the part of Mr. Murdaugh

- 40 -

because I believe I have a duty to do so and I'd be happy to do that in this situation." *Id.* at 10-11. However, the prosecutor reminded the court that he was actively seeking the death penalty in spite of any mitigating evidence. *Id.* at 11.

Petitioner then addressed the court and explained his understanding of the proceedings:

> In my six years with being in Madison Street Jail I know how everything works. I know the steps that are followed. I have had several friends that have gone through death penalty cases and gotten the death penalty, and several who have gone through death penalty cases and got natural life.

> I have also known some who have been sent out of state on interstate compact with that request coming from the Department of Corrections. And I recently learned that you do not have the power to send me out of state without the approval of the Department of Corrections.

*Id.* at 11-12.

In a motion filed immediately before the mitigation hearing, Lorona objected to the presentation of any mitigating evidence on Petitioner's behalf, explaining that Petitioner was fully aware of the mitigating evidence that the defense team had collected. ROA 239 at 2. Lorona also requested that the court determine whether Petitioner was competent to waive mitigation. *Id.* at 3. Lorona noted that he faced an ethical dilemma because Petitioner did not want him to present any mitigation, while he believed he had an obligation to argue against a death sentence. *Id.* at 4.

At the outset of the mitigation hearing on September 28, 2001, Lorona again asked the court to determine whether Petitioner was competent to waive his right to present mitigating evidence. RT 9/28/01 at 2. Lorona noted that "some time" had passed since Petitioner's Rule 11 evaluations, when the court determined that he was competent to plead guilty and assist counsel; since that time Petitioner had been evaluated by defense experts and by an expert for the State, Dr. Gina Lang. *Id.* at 3. Lorona also informed the court that based on his contact and discussions with Petitioner, and Lisa Christianson's interactions with Petitioner, he believed that Petitioner was competent to make a decision about the

presentation of mitigating evidence. *Id.* at 3-4.

The court stated that it would first make a determination as to Petitioner's competence to waive mitigation; it would then determine whether to accept the waiver. *Id.* at 9. The State called Dr. Lang to testify regarding Petitioner's competence. *Id.* at 12-13. Her testimony also addressed potential mitigating circumstances. *Id.* at 41-55.

Dr. Lang, a forensic psychologist who regularly performed Rule 11 competency evaluations, testified that she met with Petitioner for approximately 11 or 12 hours on three separate days during the week before the hearing. RT 9/28/01 at 13-15. She also reviewed the reports of Drs. Potts, Sindelar, Scialli, and Deming; information from Correctional Health Services regarding Petitioner's medical history; his written communications with jail personnel and his disciplinary record; and police reports from the crimes. *Id.* at 43-44. Dr. Lang was aware that Drs. Scialli, Sindelar, and Potts had found Petitioner competent. Based on her recent contact with Petitioner, she did not disagree with their assessments and believed that Petitioner's condition had not changed since their evaluations. *Id.* at 18-19.

Dr. Lang conducted a general psychological evaluation of Petitioner "to determine his psychological and intellectual functioning." *Id.* at 41-42. Although the examination was not specifically a competency evaluation, Dr. Lang observed nothing to indicate that Petitioner was incompetent. *Id.* at 14-16. Petitioner had no difficulty performing the psychological tests that she asked him to complete. *Id.* at 16. He appeared to understand the nature of the proceedings and the roles of the various parties involved, and there was no indication that he was mentally unable to make a decision concerning the charges against him. *Id.* at 15-17.

Dr. Lang administered an IQ test and the Minnesota Multiphasic Personality Inventory ("MMPI"). *Id.* at 44-45. Petitioner scored a 106 on the IQ test, placing him high in the average range. *Id.* at 46. Dr. Lang diagnosed Petitioner with antisocial personality disorder, based on his MMPI results and his history of violent, aggressive, and illegal activities, and with polysubstance abuse. *Id.* at 44-46.

Dr. Lang noted no impairments in Petitioner's cognitive functioning. *Id.* at 46-47.

She found no evidence that he was suffering from delusions when she interviewed him or at the time of the crime. *Id* at 47. Although Petitioner mentioned his belief that the CIA was tracking him, Dr. Lang concluded that his behavior during the offense, including luring the victim to Petitioner's residence, was inconsistent with having paranoid delusional disorder. *Id.* at 47-48. Instead, Petitioner offered Dr. Lang a different explanation for leading Reynolds to his home – that Reynolds needed to be taught a lesson for propositioning Petitioner's girlfriend. *Id.* at 49-50. Dr. Lang noted that this explanation "is not consistent with delusional process." *Id.* at 49. Petitioner also told Dr. Lang that he initially considered beating Reynolds and then releasing him but got carried away. *Id.* at 53.

Petitioner was able to recall the crime in detail, and during the offenses he displayed logic, decision-making, and planning skills. *Id.* at 49-50. According to Dr. Lang, this was consistent with Petitioner having "perfectly fine" cognitive functioning during the offense. *Id.* at 49. Moreover, Dr. Lang concluded that Petitioner's capacity to appreciate the wrongfulness of his conduct or conform his conduct with the requirements of the law was not impaired, because he engaged in behaviors during the offense that demonstrated his understanding of the law. *Id.* at 54-55. For example, he attempted to evade capture by disposing of Reynolds' vehicle and by mutilating Reynolds' body to hide its identity. *Id.*

Dr. Lang noted that Petitioner used methamphetamine on the day of the Reynolds murder, which would likely have caused feelings of euphoria, power, and energy; it also could have led him to become aggressive and paranoid. *Id.* at 52-53. Petitioner told Dr. Lang that he believed the methamphetamine may have contributed to his getting carried away while beating Reynolds. *Id.* at 53.

Based on Dr. Lang's testimony and the reports the trial court had previously reviewed, the court found that Petitioner was "competent to assist counsel, to understand the nature of these proceedings," and to "waive the right to mitigation" and "the right to present evidence." *Id.* at 20; ME 240.

At that point, the court took a break to review the caselaw and decide whether it could

compel the defense to present mitigating evidence. *Id.* at 20-21. After the break the court

ruled that because Lorona had conducted a mitigation investigation and shared the resulting

information with Petitioner, Petitioner had made a knowing and intelligent waiver of the

presentation of mitigating evidence. *Id.* at 24. The court then addressed Petitioner directly

to determine whether he wished to waive mitigation:

> COURT: Did you discuss the matters with your counsel, the information that was produced as a result of the mitigation search?
>
> DEFENDANT: I have copies of everything. And I have read everything.
>
> COURT: And knowing what that information is do you desire not to present that evidence on your own behalf?
>
> DEFENDANT: Yes, ma'am. That is my wish.
>
> COURT: You understand this is a capital case?
>
> DEFENDANT: Yes, ma'am.
>
> COURT: And that until I have all of the pieces, I don't know what I have. And that any evidence may be considered. And any evidence would be considered by this Court. There is no evidentiary standard for mitigation evidence. By that I mean the Rules of Evidence are relaxed. And it is not as though I would not consider certain matters. I would consider everything. Do you understand that?
>
> DEFENDANT: Yes, ma'am.
>
> COURT: To your knowledge was this investigation as complete as it could reasonably be?
>
> DEFENDANT: Yes, I believe so.
>
> COURT: And is it your desire that counsel not present this evidence in this hearing?
>
> DEFENDANT: That is true.

*Id.* at 25-26.

Lorona then informed the court that Petitioner did not even want him to submit the

doctors' reports and other mitigating evidence to the court as an offer of proof to be sealed

for future use. *Id.* at 26-27. The court continued:

> [T]his Court further finds that there is no failure of counsel to uphold his duty to the defendant. The Court finds that there has been no ineffective assistance of counsel in preparing for sentencing; that the preparation of

counsel has allowed the client to make a knowing and intelligent waiver and not simply a tactical waiver.

And that where the waiver is knowing and intelligent the Court will not compel the defendant to testify. He has a Fifth Amendment right not to testify. He has that right not to testify directly or indirectly through other means. Therefore, the Court will not require counsel to seal, as in the manner of an offer of proof, what that evidence might have been.

This Court will not guess what the weight of that evidence might have been on the decision that this Court will make. Rather it is the obligation of the Court to determine that the waiver was knowing and intelligent and that the assistance of counsel has been of an appropriate level.

And having made those determinations in the affirmative, there is no further basis to seal those items.

*Id.* at 27-28.

The court confirmed with Petitioner that by not sealing the items, they would be omitted from the record. Petitioner stated that he understood. *Id.* at 29-30.

The court then asked the State to present mitigating evidence on Petitioner's behalf. *Id.* at 31. The prosecutor reminded the trial court that Petitioner and his co-defendants were using methamphetamine at the time of the Reynolds murder. *Id.* at 32. The prosecutor offered materials from Petitioner's previous Rule 11 evaluations. *Id.* at 32-33. Lorona did not object because the Rule 11 reports had already been admitted. *Id.* at 34-38. The prosecutor also sought to introduce biographical information about Petitioner gathered by the mitigation specialist, hospital records from Indiana and Arkansas, and Dr. Deming's report. *Id.* at 33. Lorona advised the court that Petitioner wanted him to object to the admission of that evidence. *Id.* at 34-38.

The court ruled that Petitioner's "meaningful waiver and assertion of privacy" would be violated if it were to admit and consider evidence that the prosecutor had obtained from the defense through discovery. *Id.* at 40-41. The court concluded that it would consider the Rule 11 evaluations but not the items prepared by defense experts and the mitigation specialist. *Id.* at 37-41. The State then presented testimony from Dr. Lang in support of possible mitigating circumstances.

On October 24, 2001, Lorona filed a sentencing memorandum challenging the

aggravating factors advocated by the state and arguing in support of the (G)(1) mitigating factor. ROA 244. Lorona contended that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired because at the time of the crime he had been using methamphetamine continuously and had been "up for several days." *Id.* at 5. In accordance with Petitioner's wishes, however, Lorona restricted his sentencing memorandum to information that was already part of the record. *Id.*

On October 30, the parties again appeared in court. Lorona informed the judge that he had "done some more research about [his] duties and obligations" and had decided that it was his "duty, obligation as a lawyer, to argue for life." RT 10/30/01 at 3. He stated that he would not "advocate the death penalty on [Petitioner's] behalf, no matter what." *Id.*

At the conclusion of the hearing, the judge allowed Petitioner to address the court. Petitioner made the following statement regarding his waiver of mitigation and his desire for the death penalty:

> I wanted the Court to know that I have been a supporter of the death penalty all of my life, and raised my sons with that knowledge, as well. In fact, I wish the death penalty were expanded to cover what it use [sic] to in the form of rapists and child molesters. That is my belief.
>
> And I don't think that me being in this situation would change that belief. And it hasn't.
>
> And I am asking the Court to go ahead and proceed, and give me the death penalty, because I do not desire life in prison.
>
> My children, my two sons, have grieved for six years already with me being in here. And my circumstances where I have been in solitary lockdown for six years with very little contact.
>
> And I want the grieving to end for my own family.

RT 10/30/01 at 10-11.

Petitioner then discussed the circumstances of the murders. He informed the court that in the interim between the Eggert and Reynolds murders, he and Becky Rohrs had broken up and she had stayed with Betty Gross. *Id.* at 12-13. According to Petitioner, during that time Rohrs was free to contact the police about the Eggert murder. *Id.* Petitioner also

explained that he had killed Eggert because Eggert had threatened his stepdaughter and a woman he was dating, and that Rohrs had agreed with his plan to kill Eggert. *Id.* Petitioner further noted that during the Reynolds kidnapping and murder, all of his co-defendants had the opportunity to release Reynolds when Petitioner was not present. *Id.* at 15. He also contended that his co-defendants had lied about details of the Reynolds murder during their testimony. *Id.* at 17-18.

### (2) Postconviction proceedings

In his PCR petition, Petitioner raised a claim of ineffective assistance of counsel consisting of numerous specific allegations. (Doc. 31, Ex. 39 at 7-9, 19-21.) The PCR court held a lengthy evidentiary hearing, focusing on Petitioner's allegation that counsel performed ineffectively with respect to Petitioner's competence to waive mitigation.

Drs. Scialli and Potts testified about their competency evaluations of Petitioner. Both stated that a person's competence can change over time. RT 4/28/08 at 25; RT 5/14/08 at 12. Dr. Scialli testified that a different assessment would be required to measure competency to waive mitigation as opposed to competency to stand trial. RT 4/28/08 at 26. He would have recommended that Petitioner undergo a new evaluation prior to his waiver of mitigation. *Id.* at 29. Neither Dr. Scialli nor Dr. Potts had contact with Petitioner after December 1999.

Dr. Potts noted in his December 1999 competency evaluation that Petitioner's delusional beliefs had not changed from the time of his first competency screening. RT 5/14/08 at 49. When questioned about Petitioner's "attempted suicide," which occurred prior to the December 1999 evaluation, Dr. Potts testified that information regarding the incident would have been "helpful to know" in making a determination as to Petitioner's competence to waive mitigation. *Id.* at 21. Dr. Potts stated that he had no "independent recollection" of what collateral information he received from Lorona, but noted that there was no evidence in his file indicating that he been informed about Petitioner's suicide attempt prior to the second evaluation. *Id.* at 21-23.

Dr. Lang also testified. She stated that she was not specifically asked to evaluate

Petitioner's competence to waive mitigation. RT 5/1/08 at 19. She testified, however, that according to her evaluation Petitioner's mental condition did not affect his decision-making processes. *Id.* at 44. Dr. Lang indicated that in evaluating Petitioner prior to sentencing she had reviewed collateral material including his jail disciplinary and medical records. *Id.* at 25, 56. She could not recall whether that material included reports about Petitioner's suicide attempt. *Id.* at 68.

Holly Wake, who preceded Linda Christianson as Petitioner's mitigation specialist, testified about her relationship with Lorona and Petitioner. RT 4/30/08 at 117-18. She stated that Lorona was "nonaccessible" and that she resigned from the defense team out of frustration with Lorona's lack of involvement in the case. *Id.* at 132-38. She acknowledged, however, that her resignation letter referred only to Petitioner's refusal to cooperate with her investigation. *Id.* at 156. Wake also testified that Petitioner expressed paranoid thoughts about government agents monitoring his activities. *Id.* at 130-32. Petitioner's ex-wife told Wake that after his father's death Petitioner's mental condition had deteriorated greatly due to his methamphetamine addiction. *Id.* at 155-56.

Lisa Christianson likewise testified about her work with Lorona and her relationship with Petitioner. RT 4/28/08 at 36-38. Christianson stated that she took over Petitioner's case from Wake, who had quit because she found Petitioner "extremely difficult to work with." *Id.* at 64. During her involvement in the case, Christianson received correspondence from Lorona directing her to investigate Petitioner's chronic methamphetamine use. *Id.* at 66. She also received numerous letters from Lorona asking her to contact him and requesting that she investigate various aspects of Petitioner's case. *Id.* at 65-80.

Christianson testified that she informed Petitioner about the meaning of mitigation and explained how the presentation of mitigating evidence could help him. *Id.* at 46. Petitioner, however, was reluctant to provide her with information about his family, making it difficult for her to contact family members. *Id.* at 39-40, 49. During their conversations, Christianson "was constantly trying to encourage [Petitioner]," explaining "the importance of presenting"

evidence about his paranoid mental state and its effect on his conduct and "how that was relevant and how the judge needed to know that." *Id.* at 46. Nonetheless, Petitioner remained "adamant about the fact that this information couldn't get out, because not only would he be at risk, but he would be risking his family." *Id.* In addition to concern for his family's safety, Petitioner also indicated to Christianson that he had experienced difficulties with jail staff and other inmates and "thought his life was in danger if he was required to serve in the general population in the Arizona Department of Corrections"; therefore "he would rather be sentenced to death and he would not allow mitigation to be presented if he could not be guaranteed an out-of-state transfer." *Id.* at 84.

Despite Petitioner's reluctance, Christianson conducted a mitigation investigation, during which she obtained Petitioner's medical records and contacted Drs. Shaw and Deming to evaluate Petitioner. *Id.* at 48-49, 51-52. Christianson then wrote a mitigation report, the contents of which she discussed with Petitioner. *Id.* at 52, 57.

Christianson also testified that she was concerned about Petitioner's lack of access to defense counsel and her own difficulty in contacting Lorona. *Id.* at 44-45. However, she did inform Lorona that there was strong mitigation evidence. *Id.* at 56.

Jeff Bachtle, the defense investigator, also described his work with Lorona and Petitioner. RT 4/29/08 at 10-12. Bachtle testified that the defense operated as a team, and that he was the person who received discovery and reviewed issues with Petitioner at the jail. *Id.* at 14. Bachtle, Lorona, co-counsel Gitre, and sometimes the mitigation specialist met regularly to discuss Petitioner's defense and to ensure that the expert witnesses received the documents they needed to evaluate Petitioner. *Id.* at 42. Bachtle visited Petitioner in the jail more than 20 times. *Id.* at 17-21.

Bachtle explained that Petitioner had numerous problems with other inmates and had been labeled a "snitch" by co-defendant Dezarn. *Id.* at 21-34. Petitioner told Bachtle that his cellmate once tried to shank him. *Id.* at 24-25. Given the troubles he was experiencing in jail, Petitioner wanted to plead guilty and get the death penalty because he would have a

longer life on death row.  *Id.* at 33-36.  Petitioner also indicated that he "didn't want his family's name to be drug through the mud.  Didn't want the victim's family to be drug through the mud or relive the death of a family member."  *Id.* at 28-29; *see id.* at 38.  In addition, Petitioner did not want mitigation specialist Wake "talking to his family and digging into his past" and was "very adamant" that no one talk to his mother.  *Id.* at 41.  Instead, Petitioner wanted the death penalty so that his family could move on with their lives.  *Id.* at 41-42.

Bachtle described Petitioner as "very demanding" and heavily involved in the proceedings, providing details of the case and asking to review evidence.  *Id.* at 44-45.  Petitioner called Bachtle three to four times each week and sometimes several times a day.  *Id.* at 44.  According to Bachtle, Petitioner was able to "understand and comprehend" their conversations.  *Id.*

Bachtle testified that Lorona always addressed his concerns and suggestions quickly.  *Id.* at 49.  Bachtle did not perceive any "breakdown of duties" on the defense team; rather, "[e]veryone had a job to do, and to the best of my knowledge, they all did their job."  *Id.* at 50.  Bachtle stated that Lorona never told him not do to do something on Petitioner's case because it would be too expensive or time-consuming.  *Id.* at 51.

Lorona testified at the evidentiary hearing.  He believed that Petitioner's decision to waive mitigation was knowing and voluntary "based upon what he told me and the rationale he gave me."  *Id.* at 83.  He also felt that Petitioner's "justification was reasonable."  *Id.* at 84.  Petitioner's "vehement" desire not to present mitigation caused an "ethical dilemma" for Lorona, who felt he had a "duty to put on mitigation."  *Id.*  Thus, although he complied with Petitioner's instructions not to present the reports of Shaw, Deming, or Christianson, Lorona submitted a sentencing memorandum on Petitioner's behalf.  *Id.* at 84-85.

Lorona testified that, based on the findings of Drs. Potts, Scialli, and Sindelar, he had no reason to believe that Petitioner was incompetent.  *Id.* at 82-84.  He also did not believe, based on those reports, Dr. Lang's evaluation, and his personal contact with Petitioner, that

Petitioner's competence had diminished from the time of the Rule 11 examinations. *Id.* at 86-87, 108-10, 140-43. Although Lorona only visited Petitioner in jail five or six times, he spoke to Petitioner on the phone approximately two to three times each week, communicated by mail, and had contact with Petitioner during court appearances. *Id.* at 110, 129-30. Lorona further testified that he, along with Wake and Christianson, explained the concept of mitigation to Petitioner, who appeared to understand. *Id.* at 86. He also stated that he provided the Rule 11 examiners with whatever information they requested. *Id.*

Lorona reiterated that when Petitioner decided to plead guilty, he also wanted to receive the death penalty. *Id.* at 127-28. Given Petitioner's desire to plead guilty, Lorona recognized that sentencing would be the central issue in the case and to that end he retained a mitigation specialist at an earlier point than was typical in capital cases. *Id.* at 126-27. Lorona testified that he was "always focused on mitigation." *Id.* at 127.

It was Petitioner's desire for the death penalty that prompted Lorona to move for the Rule 11 examinations. *Id.* at 103, 128, 139. Petitioner explained to Lorona that he wanted to spare his family and the victims' families the pain of a trial and was tired of having problems with inmates in the jail. *Id.* According to Lorona, Petitioner was aware that the trial judge had never sentenced a defendant to death; thus, because Petitioner wanted "to ensure that he would receive the death penalty," he "compelled [Lorona] to voir dire Judge Hutt to ensure that she would give him the death penalty." *Id.* at 131.

Lorona acknowledged that throughout the case Petitioner expressed fringe beliefs about the CIA and the Buddhist temple murders. *Id.* at 120-21. However, these beliefs were circumscribed and had not altered or expanded since the time of the Rule 11 examinations. *Id.* at 141-42. Petitioner did not appear to have acquired any delusions beyond those he had at the time he was found competent in 1999. *Id.* at 149.

Lorona also noted that there was a period when Petitioner expressed a desire to investigate and present mitigating evidence. *Id.* at 121-22, 155-56. Subsequently, however, Petitioner changed his mind and again decided to waive mitigation. *Id.* at 156-61.

Following the evidentiary hearing, the PCR court denied Petitioner's ineffective assistance of counsel claim. (Doc. 32, Ex. 93.) The court concluded that Petitioner had not proved that he was prejudiced by counsel's performance:

> The procedure that Judge Hutt used to determine that defendant's decision to waive mitigation was knowing, intelligent, and voluntary was recently upheld by the United States Supreme Court in *Schriro v. Landrigan*, 127 S. Ct. 1933 (2007). Moreover, defendant's understanding of the significance of mitigation and certainty about not presenting any was no less clear or unequivocal than was upheld in *Schriro*. *Id.* at 1942. Because defendant offered no testimony at the Rule 32.8 hearing, no evidence was proffered, presented, or [sic] to show that defendant was precluded, deluded, truncated, tricked, cajoled, or threatened into waiving mitigation.

> Interspersed throughout defense counsel's Rule 32 pleadings and Rule 32.8 presentation is the stated and implied argument that the strongest proof of defendant's incompetence is that he waived mitigation. The fallacy of this argument is the case law that recognizes that a defendant who decides to waive mitigation can still be competent and, in fact, has the right to waive mitigation even over his counsel's better judgment. As stated by the United States Supreme Court, neither *Wiggins v. Smith*, 539 U.S. 510 (2003), nor *Strickland* addresses the situation in which a client interferes with counsel's effort to present mitigating evidence to a sentencing court. *Schriro*, at 1942. More significantly, the Supreme Court held "that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further mitigating evidence." *Schriro*, at 1942.

> While defendant's Rule 32 counsel have attacked Mr. Lorona's performance as deficient, they have provided no new evidence that would have caused Judge Hutt to re-consider her weighing of aggravating factors and mitigating circumstances, and finding that death was the appropriate sentence. Similarly, they have provided no new evidence that would have caused the Supreme Court to re-consider their *de novo* weighing of aggravating factors and mitigating circumstances, and finding that death was the appropriate sentence.

> . . . .

> In the present case, no new mitigating evidence was proven or proffered. No evidence, no affidavit, no testimony was proffered at the Rule 32.8 hearing by defendant that he was duped, tricked, misinformed, misled, deluded, or coerced by Mr. Lorona or by his mental condition at any time before sentencing into waiving mitigation or forbidding Mr. Lorona from presenting mitigation.

> In their Closing Brief, defense counsel state, "In light of the mitigation evidence that could have been presented but was not, there is a reasonable probability that [defendant] would not have been sentenced to death." To the extent that defendant's Rule 32 claim is that trial counsel failed to more effectively present mitigation at the time of the 1995 murders, the claim is insufficient. Both Judge Hutt and the Supreme Court considered the mental

health experts' reports touching on defendant's 1995 state of mind despite defendant's objection to do so.

There was no evidence presented or proffered at the Rule 32.8 hearing that defendant's 1995 mental condition deprived him of the ability to differentiate right from wrong. As stated recently in *State v. Boggs*, 218 Ariz. 325 (2008), without a causal link between the murders and a defendant's mental health issues, these mitigating circumstances are entitled to less weight. *Boggs*, ¶ 96; *See also*, *Belmontes v. Ayers*, 529 F.3d 834, 861-64 (9th Cir. 2008) (inadequacy of habeas counsel's mitigating circumstances evidence)

CONCLUSION

Defendant has failed to produce evidence that his competence at the time of waiving mitigation had deteriorated from the time when Doctors Sindelar, Scialli, and Potts deemed him competent at the time of his change of plea. Nothing in the record, or evidence presented during the evidentiary hearing shows that defendant's delusions or belief system changed from the time of his competency evaluations to the time of sentencing.

On each occasion that defendant and Judge Hutt interacted directly, defendant was responsive and appropriate. Defendant repeatedly assured the trial court at both the plea and sentencing that he understood the proceedings as well as the consequences.

The trial court found that defendant was competent at the time he decided to waive mitigation. The trial court found that defendant's decision to waive mitigation was knowingly and voluntarily made. No evidence has been presented to undermine the trial court's findings. A competent defendant has the right to ignore the intelligent advice of his counsel.

Because defendant has failed to meet the prejudice prong of *Strickland*, any comment by this Court regarding trial counsel's performance would be dicta.

(*Id.* at 16-17.)

### (3) Claim 4

Petitioner alleges that trial counsel performed at a constitutionally ineffective level with respect to Petitioner's competency to waive mitigation and the investigation and presentation of mitigating evidence. (Doc. 35 at 137.) Respondents concede that this claim is exhausted.

<u>Clearly established federal law</u>

The right to effective assistance of counsel applies not just to the guilt phase but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)).

In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Strickland*, 466 U.S. at 689-90. The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687).

With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), the Court noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98). Recently, the Court reiterated that "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." *Belmontes*, 130 S. Ct. at 390-91.

Analysis

Petitioner raises numerous specific allegations in support of Claim 4. He contends that Lorona "should have been aware of facts" that would have raised a reasonable doubt about Petitioner's competency to waive mitigation; misled the court by representing that he "had enough interactions with [Petitioner] and knowledge of his delusional disorder to opine on his competency"; did not "explain the concept of mitigating evidence to Petitioner or attempt to dissuade him from waiving mitigation evidence"; failed to secure an independent competency evaluation; failed to provide the court-appointed mental health experts with "relevant documents and information regarding his relationship with his client and his

client's delusions"; failed to secure a "complete social history of Petitioner"; presented mitigation in a "half-hearted manner"; and "successfully bur[ied] substantial evidence regarding competency and mitigation." (Doc. 35 at 137-38.) Petitioner asserts that he was prejudiced because, if counsel had presented more evidence regarding Petitioner's mental problems, he likely would have been found incompetent and received a life sentence. (*Id.* at 138.)

None of these allegations entitle Petitioner to relief. The record does not support the contention that Lorona was unaware of or misrepresented Petitioner's mental condition, that Petitioner was not competent to waive mitigation, that his waiver was not knowing and voluntary, or that the defense team did not investigate and prepare a case in mitigation.

As an initial matter, there is no dispute that a defendant may waive the presentation of mitigating evidence. In *Blystone v. Pennsylvania*, the United States Supreme Court held that no constitutional violation occurred when a defendant was allowed to waive all mitigation evidence after repeated warnings from the judge and advice from counsel. 494 U.S. 299, 306 & n.4 (1990).

Petitioner's primary contention is that trial counsel performed ineffectively by failing to argue that Petitioner was not competent to waive mitigation. He asserts that as a result of this failure, his waiver was not knowing and intelligent. These arguments are unpersuasive.

As previously noted, the standard for competence to stand trial, plead guilty, or waive the right to counsel is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" along with "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402; *see Godinez v. Moran*, 509 U.S. at 396, 399-401. While some courts have used this standard to determine competency to waive mitigation, *see Wood v. Quarterman*, 491 F.3d 196, 204 (5th Cir. 2007); *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001), the Supreme Court in *Landrigan* explained that it has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" and has "never required a specific

colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Landrigan*, 550 U.S. at 479.

As previously recounted, when Petitioner decided to plead guilty, Lorona moved for an evaluation of his competency. Following Dr. Potts' pre-screening competency evaluation, two court appointed experts evaluated Petitioner. Drs. Scialli and Sindelar determined that Petitioner was competent while noting his fringe beliefs and his chronic methamphetamine addiction. Immediately before Petitioner pled guilty, Lorona moved for a third competency evaluation. Dr. Potts found that there had been no changes since his last evaluation and concluded that Petitioner was competent to weigh his options and assist his attorney. Dr. Potts further opined that Petitioner's delusions and paranoia were circumscribed and had minimal bearing on the proceedings.

When Petitioner decided to waive mitigation, Lorona requested that the court make a determination of his competence even though Lorona believed that Petitioner was competent. In making this request Lorona noted that Petitioner had already been found competent by three court-appointed experts and by Dr. Lang and that, based on his and the defense team's contact with Petitioner, there was no basis to question his competency. Lorona did not perform ineffectively in making this representation to the court. He was entitled to rely on the findings of the experts in reaching his opinion of Petitioner's competence. *See Moran v. Godinez*, 57 F.3d at 699-700 ("Because counsel could rely on the psychiatrists' reports that Moran was competent to stand trial, it was unnecessary for them to investigate his competence to plead guilty, waive counsel or forego the presentation of mitigating evidence."), *superceded on other grounds by AEDPA*; *see also Taylor v. Horn*, 504 at 438-39 (rejecting claim that counsel performed ineffectively in not seeking competency evaluation where counsel reasonably relied on two expert evaluations reports finding defendant competent); *Galowski v. Berge*, 78 F.3d 1176, 1182 (7th Cir. 1996) (counsel not ineffective for failing to seek a competency hearing when defense expert determined defendant was competent). Lorona also had a duty of candor to the court and

recognized that the competency issue had to be addressed in light of Petitioner's insistence on waiving mitigation. Counsel's actions in this regard were not unreasonable.

Moreover, the record does not support Petitioner's assertion that he was in fact incompetent to waive mitigation. Dr. Shaw's report did not address the competence issue at all. (*See id.*, Ex. 73.) Dr. Deming, on whose findings Petitioner primarily relies for his claim that he was incapable of knowingly and voluntarily waiving mitigation, did not evaluate Petitioner's competence but prepared his report for mitigation purposes, with a focus on Petitioner's compromised mental functioning at the time of the murders. (*See* Doc. 35, Ex. 87 at 16-20.) By contrast, Drs. Potts, Scialli, and Sindelar had evaluated Petitioner concerning his competence to waive his rights and assist his attorney. In addition, Dr. Lang, who examined Petitioner immediately before his waiver and who was familiar with legal competency standards, opined that Petitioner was competent, as she had detected no changes in his mental status since the prior evaluations. Dr. Lang found no evidence that Petitioner was incompetent or that his cognitive functioning was impaired.

The contents of Dr. Deming's mitigation report do not alter this court's conclusion that Petitioner was competent to waive mitigation. Dr. Deming diagnosed Petitioner with delusional disorder, substance abuse and dependence, and post-concussion disorder. (Doc. 35, Ex. 87 at 1, 9.) However, these findings are consistent with those of the Rule 11 experts concerning the scope and nature of Petitioner's delusions, (*id.* at 10-15), and fail to suggest that Petitioner did not have a "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.

Dr. Deming found that Petitioner's "cognitive functioning" was "intact revealing above-average I.Q. by estimate, with a quick flow of thoughts, and no hesitation in answering questions." (Doc. 35, Ex. 87 at 3.) He noted that Petitioner's memory was "intact for immediate, recent, and remote events, even with incredible detail and sophistication of memory." (*Id.* at 4.) Petitioner was able to interpret proverbs "with abstraction and the capability for objectivity," and was "oriented to person, place, and situation." (*Id.*) There

was "no evidence of any suicidal ideation" and "no acute auditory or visual hallucinations." (*Id.*) Dr. Deming noted Petitioner's "tremendous social skills," stating that he was a "natural leader, with good confidence in his ability to talk and direct other people's behavior." (*Id.*) He found that Petitioner was "acutely interested in making sure he understands where people are, where they are going, and how they relate to him at all times." (*Id.*) In sum, Dr. Deming's report is not inconsistent with any of the previous evaluations, none of which establish that Petitioner lacked the mental capacity to offer a knowing and voluntary waiver of the presentation of mitigating evidence.

Likewise there is no evidence that Petitioner's decision to waive mitigation was uninformed. Prior to Petitioner's waiver, members of the defense team interacted with him on a regular basis. Lorona spoke to Petitioner on the telephone two to three times a week and discussed the case with him during court appearances. Bachtle, the defense investigator, routinely visited Petitioner at the jail. The mitigation specialists began their investigation in 1997, met with Petitioner regularly, and explained their role in his defense. *See* RT 4/28/08 at 39, 46; Doc. 35, Ex. 85 at 1. In addition, Lorona retained Drs. Shaw and Deming to evaluate Petitioner for mitigation purposes; they both prepared reports discussing Petitioner's background, drug problems, and mental state. (Doc. 35, Ex's 73, 74.) Linda Christianson also prepared a mitigation report. (*Id.*, Ex. 14.)

The record further belies Petitioner's contention that as a result of counsel's deficiencies, Petitioner was unfamiliar with the concept of mitigation. Petitioner's letters to Lorona and Bachtle demonstrate that he understood the nature and purpose of mitigating information. He wrote that he believed Lorona's infrequent jail visits could be used as evidence of ineffective assistance and might prove mitigating. (Doc. 35, Ex. 44.) During the period before his final decision to waive mitigation, Petitioner recognized the importance of contacting friends and family members to speak on his behalf, and in being evaluated by experts to show that he might be prone to "sudden violence" or that his methamphetamine addiction caused him not to understand what he was doing when he committed the murders.

(*Id.*, Exs. 42, 44.) Bachtle wrote a memo to Lorona dated August 30, 1999, in which he noted, "According to Murdaugh, Dr. Potts will testify at his mitigation hearing that he could NOT control his actions because of the heavy methamphetamine addiction." (*Id.*, Ex. 42.)

In his colloquy with the court, Petitioner stated that he had received and reviewed all of the mitigating information, that he believed the information was complete, but that he did not want any of it presented. RT 9/28/01 at 25-26. The court found that Petitioner knowingly and intelligently waived his right to present mitigating evidence. *Id.* at 27-28. The court also determined that "there is no failure of counsel to uphold his duty to the defendant" and "no ineffective assistance of counsel in preparing for sentencing" and that "the preparation of counsel has allowed the client to make a knowing and intelligent waiver and not simply a tactical waiver." (*Id.* at 27.)

Moreover, Petitioner cannot prove that he was prejudiced by counsel's failure to seek an additional mental health examination prior to Petitioner's waiver. Petitioner presented no evidence at the PCR evidentiary hearing demonstrating that the trial court's findings as to his waiver of mitigation or the court's sentencing decision would have been any different if Lorona had sought a new expert evaluation. Likewise Petitioner has offered no evidence demonstrating that his competence had actually deteriorated following the evaluations of Drs. Potts, Scialli, and Sindelar.

Petitioner also contends that counsel failed to investigate and prepare a case in mitigation and that this failure prejudiced the defense. Besides being rendered moot by Petitioner's decision not to offer mitigating evidence (discussed below), this allegation is not supported by the record. Lorona did not fail to pursue a mitigation case or conduct only a truncated investigation. Instead, with the aid of a mitigation specialist, he undertook a full-scale investigation, gathering background information and retaining mental health experts. Linda Christianson, in preparing her mitigation report, met with Petitioner 10 times, reviewed his medical and military records, interviewed his mother, sister, sons, and girlfriend, and contacted other family members who refused to be interviewed. (Doc. 35, Ex. 85 at 1.)

Lorona was prepared to present the results of this investigation in the form of Christianson's mitigation report and the evaluations performed by Drs. Deming and Shaw. However, it was the admission of this evidence, along with the supporting jail and hospital records, to which Petitioner specifically objected. Thus, when the prosecutor attempted to offer Dr. Deming's report to the court for purposes of mitigation, Petitioner directed Lorona to object and to prevent any information in the report from being entered into evidence. RT 9/28/01 at 34-38.

Nevertheless, the trial court at sentencing reviewed for mitigation purposes the Rule 11 competency evaluations, Dr. Lang's testimony, and other evidence in the record. Based on that information, the court found that Petitioner's paranoia, mental problems, and drug abuse constituted mitigating circumstances. However, balanced against these mitigating circumstances were two weighty aggravating factors. Petitioner had been convicted of a separate first degree murder. The killing of Reynolds was especially heinous or depraved; the crime was senseless, the victim was helpless, and Petitioner mutilated the victim's body. *See Van Hook*, 130 S. Ct. at 20 (finding defendant could not prove prejudice from counsel's failure to present more mitigating evidence given strong aggravating circumstances "[o]n the other side of the scales"). Given the strength of the aggravating factors, Petitioner's knowing and voluntary waiver of the mitigating information uncovered by counsel, and the trial court's consideration of the available mitigating evidence, Petitioner cannot show that he was prejudiced by Lorona's performance at sentencing.

Furthermore, as the PCR court noted, relief on Claim 4 is foreclosed by the holding in *Landrigan*, 550 U.S. 465. Petitioner cannot establish prejudice from counsel's performance at sentencing because he waived the presentation of mitigating evidence and thereby prevented the trial court from hearing the mitigating information procured by Lorona and the defense team.

In *Landrigan*, the petitioner refused to allow defense counsel to present the testimony of his ex-wife and birth mother as mitigating evidence. He also interrupted as counsel tried

to proffer other evidence and told the Arizona trial judge that he did not wish to present any mitigating evidence and to "bring on" the death penalty. The court sentenced him to death and the sentence was affirmed on direct appeal. *State v. Landrigan*, 176 Ariz. 1, 859 P.2d 111 (1993). The PCR court rejected Landrigan's request for a hearing and denied his claim that counsel was ineffective for failing to conduct further investigation into mitigating circumstances, finding that he had instructed counsel at sentencing not to present any mitigating evidence at all. Landrigan then filed a federal habeas petition. The district court denied the petition and refused to grant an evidentiary hearing because Landrigan could not make out a colorable claim of ineffective assistance of counsel. A panel of the Ninth Circuit affirmed. *Landrigan v. Stewart*, 272 F.3d 1221 (9th Cir. 2001). The en banc Ninth Circuit reversed, holding that counsel's performance at sentencing was ineffective. 441 F.3d 638 (9th Cir. 2006). According to the court, Landrigan's "last-minute decision could not excuse counsel's failure to conduct an adequate investigation prior to sentencing." *Id.* at 647. The court then reiterated its view "that a lawyer's duty to investigate [mitigating circumstances] is virtually absolute, regardless of a client's expressed wishes." *Id.*

The Supreme Court reversed. *Schriro v. Landrigan*, 550 U.S. 465. The Court held that the district court did not abuse its discretion in failing to hold an evidentiary hearing on Landrigan's claim of sentencing-stage ineffectiveness and that the court was within its discretion in denying the claim based on Landrigan's unwillingness to present mitigation evidence. *Id.* at 481.

*Landrigan* establishes the standard for evaluating a sentencing-stage ineffective assistance claim brought by a petitioner who directed counsel not to offer a case in mitigation. "If [the petitioner] issued such an instruction, counsel's failure to investigate further could not have been prejudicial under *Strickland*." *Id.* at 475; *see Owen v. Guida,* 549 F.3d 399, 406 (6th Cir. 2008) ("a client who interferes with her attorney's attempts to present mitigating evidence cannot then claim prejudice based on the attorney's failure to present that evidence"); *see also Taylor v. Horn*, 504 F.3d at 455 (no *Strickland* prejudice where

petitioner refused to allow presentation of mitigating evidence); *Wood v. Quarterman*, 491 F.3d at 203 ("Neither the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence."); *Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) ("Lovitt is correct to insist that a client's decision in this regard should be an informed one. At the same time, Lovitt's lawyers were hardly ineffective for incorporating their client's wishes into their professional judgment."); *Rutherford v. Crosby*, 385 F.3d 1300, 1313-14 (11th Cir. 2004) ("[U]nder *Strickland* the duty is to investigate to a reasonable extent . . . and that duty does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area of defense and to obtain a court order in defiance of his wishes."); *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993) ("[C]ounsel for Jeffries had been prepared to present evidence in mitigation and had discussed with Jeffries the ramifications of failing to present the evidence. Accordingly, counsel did not deprive Jeffries of effective assistance in acquiescing in the latter's considered decision."). Because Petitioner unambiguously instructed Lorona not to present a case in mitigation, he was not prejudiced by Lorona's failure to disobey his instructions.

Conclusion

Petitioner has not demonstrated that trial counsel performed at a constitutionally ineffective level in his handling of the issue of Petitioner's competence to waive mitigation or in the investigation and presentation of mitigating evidence. The record does not support the allegation that Lorona failed to take Petitioner's mental state into account or that he neglected his duties in preparing for sentencing. Further, no prejudice existed because Petitioner chose not to present mitigating evidence.

"A defendant cannot be permitted to manufacture a winning [ineffective assistance of counsel] claim by sabotaging her own defense, or else every defendant clever enough to thwart her own attorneys would be able to overturn her sentence on appeal." *Owens*, 549 F.3d at 412 (citing *Landrigan*, 550 U.S. at 475-76). This principle applies to Petitioner's

case.

The PCR court's rejection of this claim did not represent an unreasonable application of clearly established federal law as set forth in *Strickland* and *Landrigan*. Therefore, Claim 4 is denied.

### (4)    Claims 5, 6, and 7

In Claim 5, Petitioner alleges that the trial court failed to make an adequate determination of his competence to waive mitigation. (Doc. 35 at 156.) In Claim 6, he alleges that he was incompetent when he waived mitigation and therefore the waiver was not knowing and voluntary. (*Id.*) Respondents contend that these claims are procedurally defaulted and barred. (Doc. 38 at 129.) In Claim 7, Petitioner alleges that ineffective assistance of appellate counsel excuses any default of Claim 5 or 6. (Doc. 35 at 157.) Respondents concede that Claim 7 is exhausted. (Doc. 38 at 124.)

Petitioner raised these claims in his PCR petition. (Doc. 31, Ex. 39 at 16-19, 31-33.) The PCR court found Claims 5 and 6 precluded under Ariz. R. Crim. P. 32.2(a)(1) and (3) because they could have been raised on direct appeal. (*Id.*, Ex. 98 at 4-5.) The court alternatively held:

> [T]he record demonstrates that defendant was aware of the mitigation evidence that could be presented through Dr. Deming and Dr. Shaw, and the mitigation specialist, but that he decided not to present it after reviewing it. The trial court found that defendant's decision to waive the presentation of mitigating evidence was voluntary, knowing, and intelligent, and that he was competent to make that decision at the time.
>
> Moreover, even in the absence of defendant's presentation, the trial court, as it was obliged to do, considered and found mitigation nonetheless. Defendant's claim, therefore, is not colorable, and is summarily denied pursuant to Rule 32.6(c).

(*Id.*) The PCR court's determination that the claims had been waived constitutes an adequate state procedural bar. *See Smith*, 536 U.S. at 860; *Ortiz*, 149 F.3d at 931-32; *see also Harris*, 489 U.S. at 264 n. 10.

However, as noted, Petitioner alleges ineffectiveness of appellate counsel as cause to excuse the default. To establish ineffective assistance of counsel on appeal, Petitioner must

show that counsel's performance was deficient and that the deficiency resulted in prejudice. *Strickland*, 466 U.S. at 687; *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) (recognizing the right to effective assistance of counsel for a first appeal as of right). To establish prejudice, Petitioner must show that there is a "reasonable probability" that, absent counsel's errors, the result of the appeal would have been different. *Strickland*, 466 U.S. at 694; *see Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001) ("When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue."); *Bailey v. Newland*, 263 F.3d 1022, 1033-34 (9th Cir. 2001). Thus, the court will assess the merits of Claims 5 and 6 to determine whether, if they had been raised on appeal, there is a reasonable probability they would have been successful.

Petitioner contends in Claim 5 that the trial court failed to make an adequate determination that he was competent to waive mitigation. The court disagrees. At the time of the waiver, the trial court had no information supporting a bona fide doubt about Petitioner's competence and therefore was not obligated to undertake a more thorough competency determination.

The court had been provided with three Rule 11 reports indicating that Petitioner was competent to stand trial and plead guilty. The court further heard the testimony of Dr. Lang, who opined that Petitioner was competent to waive mitigation. Lorona also informed the court that he had no reason to question Petitioner's competence.

As discussed above, Petitioner did not exhibit "extremely erratic or irrational behavior during the course of trial." *Boag*, 769 F.2d at 1344. To the contrary, the trial judge had observed Petitioner in court over a period of several years. He consistently engaged in rational colloquies with the court, including at the time of his guilty pleas and when he waived mitigation. Petitioner did not have a "lengthy histor[y] of acute psychosis and psychiatric treatment." *Id.* Instead, the record indicated only one previous hospitalization for mental health issues, an incident caused by drug abuse and resolved as the effects of the

drugs dissipated.  Finally, the court again notes that under *Landrigan*, even assuming that a waiver of mitigating evidence must be knowing and voluntary, no specific colloquy was needed to establish a valid waiver.  550 U.S. at 479.

Petitioner's arguments in Claim 6, alleging that he was incompetent when he waived mitigation, are equally unavailing.  As set forth above, it is Petitioner's burden to prove incompetence.  He has failed to meet that burden.  The record reflects that the state court's competency determination was not unreasonable, and Petitioner has failed to rebut that determination with clear and convincing evidence.  Therefore, his claim that he was incompetent to waive mitigation must fail.  *See Demosthenes v. Baal*, 495 U.S. at 735.

Based on this analysis, Claim 7, alleging ineffective assistance of appellate counsel due to counsel's failure to raise Claims 5 and 6 on appeal, is without merit.  Because the underlying claims are meritless, Petitioner was not prejudiced by appellate counsel's failure to raise them.  Therefore, appellate counsel's performance does not excuse the default. *Carrier*, 477 U.S. at 492.  Claims 5, 6, and 7 are denied.

**C.** **Conflict of Interest: Claims 12 and 13**

In Claim 12, Petitioner alleges that trial counsel labored under an unconstitutional conflict of interest because he represented Petitioner pursuant to a flat-fee contract with the OCAC.  (Doc. 35 at 210.)  He makes the same argument in Claim 13 with respect to appellate counsel.  (*Id.* at 225.)  Respondents contend that only the Sixth Amendment aspect of Claim 12 is exhausted and that Claim 13 is procedurally barred because Petitioner failed to state a federal basis for the claim in his petition for review to the Arizona Supreme Court.  (Doc. 38 at 157-58, 161.)  Because Claim 13, like Claim 12, is plainly meritless, the Court will deny both claims on the merits without addressing their procedural status.

Petitioner raised these claims in his PCR petition.  (Doc. 31, Ex. 39 at 21-23, 33.)  The PCR court rejected them as not colorable, explaining, with respect to trial counsel's alleged conflict of interest:

Defendant seeks Rule 32 relief claiming that inadequate public

financing of his trial counsel created a conflict of interest with his attorney. He argues that the funding structure for indigent representation created a Hobson's Choice for his attorney – do less than what the case required for the money paid, or do what the case required, some of which would be uncompensated.

Funding in defendant's case, as with every other indigent defendant in Maricopa County not represented by a public defender, was administered by the Office of Court Appointed Counsel (hereinafter OCAC). As with every other indigent defendant in Maricopa County not represented by a public defender, defendant's counsel was paid by a fixed fee contract with the OCAC. Defendant claims that the amount of the fixed fee contract is inadequate on its face, and deprived counsel of the ability to adequately represent him.

Defendant provides no factual support for the claim, or specifies anything counsel did not do for defendant because of insufficient compensation. His claim cynically assumes that any attorney will only represent his client to the extent he is paid. Defendant's claim also requires this Court to find that OCAC's authorized pay scale is inadequate as a matter of law. There is no legal support for such a claim.

(Doc. 32, Ex. 98 at 5-6.) Using the same analysis, the court rejected Petitioner's claim that appellate counsel's performance was affected by a financial conflict of interest. (*Id.* at 7.)

The PCR court's ruling was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

To be entitled to relief on these claims, Petitioner must show that the fee arrangement constituted an actual conflict of interest. "Under this standard, an actual conflict is a conflict that affected counsel's performance – as opposed to a mere theoretical division of loyalties." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (quoting *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)); *see Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). The Ninth Circuit has explained that "to show adverse effect, a defendant need not demonstrate prejudice – that the outcome of his trial would have been different but for the conflict – but only that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* at 733 (quotation omitted) (holding that a fee arrangement by which co-defendant paid defendant's attorney did not adversely affect attorney's performance).

Petitioner has not met this standard. He has shown at most that the flat fee arrangement constituted a theoretical conflict of interest. In *Williams v. Calderon,* 52 F.3d 1465, 1473 (9th Cir. 1995), the petitioner argued that "the fact that payment for any investigation or psychiatric services could have come from counsel's pocket forced counsel to choose between Williams' interests and his own." *Id.* The court "discern[ed] in this situation no conflict of constitutional dimension," explaining that "[a]ll Williams alleges is the same theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case. Such arrangements, without more, do not require Sixth Amendment scrutiny." *Id.*; *see Bonin v. Calderon*, 59 F.3d 815, 827 (9th Cir. 1995) (no actual conflict based on counsel's substitution as retained counsel depriving defendant of state-funded investigators and expert witnesses and requiring attorney to pay for any investigative experts out of his own pocket ); *United States v. Stitt*, 552 F.3d 345, 350-51 (4th Cir. 2008) (petitioner failed to show fee arrangement had adverse effect on counsel's performance where there was no showing that hiring out-of-state investigation was plausible, objectively reasonable strategy); *Hand v. Secretary, Dept. Of Corrections*, 305 Fed.Appx. 547, 550 (11th Cir. 2008) (state court did not unreasonably apply clearly established federal law by finding no prejudice where defense counsel represented defendant on a fixed fee with all costs and expenses to be paid by counsel).

Petitioner has failed to show that the fixed-fee arrangement had an adverse effect on counsel's performance. Petitioner asserts that the contract hindered Lorona's performance and prevented him from retaining defense experts. Notwithstanding the contract, however, the record shows that Lorona hired investigators who worked on Petitioner's case throughout the guilt phase, hired a mitigation specialist early in the case, and was assisted by co-counsel.

During the PCR evidentiary hearing, Lorona acknowledged a dispute with OCAC concerning his fees in Petitioner's case but testified that it did not affect his representation. RT 4/29/08 at 96-97, 116. With respect to his statement that he did not hire an independent expert to evaluate Petitioner's competency to waive mitigation because he believed that the

OCAC would not have paid for it, Lorona clarified that he felt the OCAC would not have permitted him to hire an expert who was not on the office's approved list. *Id.* at 114-15. Defense investigator Bachtle testified that he never perceived any breakdowns on the defense team, and that everyone on the team performed his or her job properly. *Id.* at 50. Bachtle further stated that Lorona never directed him to curtail his investigation based on cost. *Id.* at 51. While other witnesses, including mitigation specialist Christianson, *see* RT 4/28/08 at 44-45, opined that Lorona neglected his duties, there was no indication that these alleged deficiencies were due to funding issues. In sum, Petitioner has not demonstrated that any plausible alternative strategy or tactic was foregone due to funding issues.

The same analysis applies to appellate counsel. While Petitioner criticizes the brief prepared by appellate counsel, he offers no evidence tying its alleged inadequacies to any funding issues.

Claims 12 and 13 are without merit and will be denied.

**D.     Presentation of Mitigating Evidence: Claims 14, 15, and 16**

Petitioner raises several claims based on the trial court's order directing the prosecutor to present mitigating evidence. In Claim 14, Petitioner alleges that he was denied his right to conflict-free representation because "the advocate who presented mitigating evidence" was also "charged with securing the . . . death sentence." (Doc. 35 at 233, 239.) In Claim 15, he alleges that he received ineffective assistance based on trial counsel's failure to challenge the court's order. (*Id.* at 246.) In Claim 16, he alleges ineffective assistance of appellate counsel based on counsel's failure to raise the issue on appeal. (*Id.* at 252.) Respondents concede that Claims 15 and 16 are exhausted but contend that Claim 14 is procedurally defaulted. Regardless of the procedural status of Claim 14, it is meritless, as are Claims 15 and 16.

As noted above, Petitioner waived mitigation and directed Lorona not to present any evidence. In response, the trial court directed the prosecution to offer any mitigating evidence it possessed. Petitioner's challenges to this process are unfounded.

Arizona law specifically provides for the presentation of mitigating evidence by the

State.  As set forth in A.R.S. § 13-703(C):

> At the penalty phase of the sentencing proceeding that is held pursuant to section 13-703.01, the prosecution or the defendant may present any information that is relevant to any of the mitigating circumstances included in subsection G of this section, regardless of its admissibility under the rules governing admission of evidence at criminal trials.

Similarly, A.R.S. § 13-703(G) states in relevant part, "The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence of less than death."  Therefore, if defense counsel had objected to the court's order, such an objection would not have been sustained.

Moreover, Petitioner cannot prove that he was prejudiced by counsel's performance, given that he waived the presentation of any mitigation evidence.  A successful objection by Lorona simply would have prevented the presentation of the evidence offered by the prosecution.  There was not a reasonable probability of a different sentence if counsel had managed to forestall the presentation of additional mitigating information.  Appellate counsel did not perform ineffectively by failing to raise this meritless issue.  Claims 14, 15, and 16 are denied.

**E.** ***Ring* Error: Claims 1 and 2**

**(1)    Claim 1**

Citing *Ring v. Arizona*, 536 U.S. 584 (2002) ("*Ring II*"), Petitioner alleges that he was denied the right to a jury trial in violation of the Sixth and Fourteenth Amendments.  (Doc. 35 at 89.)  He asserts that the denial of his right to be sentenced by a jury constituted structural error and requires "reversal of his death sentence and a remand for resentencing." (*Id.*)  He also contends that the Arizona Supreme Court erred in its application of the harmless error standard because it was "unreasonable to find that a rational juror could not view the aggravating and mitigating evidence differently than the trial judge and find that a life sentence was appropriate." (*Id.*)  Respondents concede that the claim is exhausted.

Harmless error standard

In *Ring II*, the United State Supreme Court invalidated Arizona's judge-only capital

sentencing scheme by holding that a jury must determine the existence of facts rendering a defendant eligible for the death penalty. 536 U.S. at 609. Subsequently, the Arizona Supreme Court, in *State v. Ring ("Ring III")*, 204 Ariz. 534, 552, 65 P.3d 915, 933 (2003), held that the Sixth Amendment "does not require automatic reversal of a death sentence imposed under [Arizona's] former sentencing statutes." Instead, relying on *Neder v. United States*, 527 U.S. 1, 8 (1999), and *Arizona v. Fulminante*, 499 U.S. 279, 306-07 (1991), the court held that it would review capital sentences under the harmless error standard. *Id.* at 552-53, 65 P.3d at 933-34. Noting that it had "repeatedly rejected" the argument that *Ring* error is structural, the Arizona Supreme Court applied the harmless error test in evaluating Petitioner's death sentence. *Murdaugh*, 209 Ariz. at 29-30, 97 P.3d at 854-55. This was not contrary to or an unreasonable application of clearly established federal law.

A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulminante*, 499 U.S. at 310. Structural error affects "the entire conduct of the trial from beginning to end." *Id.* at 309. The "very limited class of cases" in which structural error has been found feature "such defects as the complete deprivation of counsel or trial before a biased judge," which "necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 8 (finding that a jury instruction omitting an element of the offense does not constitute structural error).

The United States Supreme Court has never held that *Ring* error is included in that limited class of cases. In *Ring II* itself, the Court declined to "reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict." 536 U.S. at 609 n.7; *see id.* at 621 (Justice O'Connor dissenting) ("I believe many of these challenges will ultimately be unsuccessful . . . because the prisoners will be unable to satisfy the standards of harmless error."). Subsequently, in *Schriro v. Summerlin*, holding that *Ring II* did not apply retroactively, the Court rejected claims that *Ring II* was either a substantive ruling or a "watershed rule[] of criminal procedure implicating the fundamental

fairness and accuracy of the criminal proceeding," explaining that it could not "confidently say that judicial factfinding so *seriously* diminishe[s] accuracy that there is a large risk of punishing conduct the law does not reach." 542 U.S. 348, 355-356 (2004) (interior quotations omitted).

As the Arizona Supreme Court explained in *Ring III*, 204 Ariz. at 545, 554-55, 65 P.3d at 926, 935-36, the holding in *Ring II* was preceded by, and premised on, the ruling in *Apprendi v. New Jersey*, which held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). There is no question that *Apprendi* errors are subject to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 218-22 (2006) (holding that *Apprendi* errors are reviewed for harmlessness using the framework of *Neder*); *see also United States v. Zepeda-Martinez*, 470 F.3d 909, 910 (9th Cir. 2006).

The Arizona Supreme Court did not unreasonably apply Supreme Court precedent when it determined that harmless error was the appropriate standard of review. *Ring* error does not affect the framework within which the trial proceeds or the entire conduct of the trial, but only the trial process itself. The court properly found that *Ring* error, like the failure to instruct a jury on an element of the offense, was not so fundamental that it necessarily rendered Petitioner's capital sentence unfair or unreliable.

Arizona Supreme Court's harmless error analysis

On direct appeal, the Arizona Supreme Court rejected Petitioner's argument that it could not determine beyond a reasonable doubt that no jury would find the mitigating circumstances sufficient to call for leniency. *Murdaugh*, 209 Ariz. at 30, 97 P.3d at 855. In conducting its harmless error review, the Arizona Supreme Court first considered and affirmed the two aggravating factors found at sentencing. The court noted that the first factor – that Petitioner had been convicted of another offense for which for which a life sentence or the death penalty was imposable under A.R.S. § 13-703(F)(1) – consisted of a legal rather than a factual determination and was thus outside the mandate of *Ring II*. *Id.* The court

stated that the factor was satisfied by Petitioner's conviction for the kidnapping and murder of Eggert, offenses to which Petitioner pled guilty with the knowledge that the conviction would be used as an aggravating factor. *Id.* at 30-31, 97 P.3d at 855-56.

The court next considered the aggravating factor set forth in §13-703(F)(6), that the murder was especially cruel, heinous, or depraved, explaining that under *Ring II* "determination of the existence of the (F)(6) aggravator by a judge constitutes reversible error unless this court determines beyond a reasonable doubt that such error is harmless." *Id.* at 31, 97 P.3d at 856. The court determined that the (F)(6) factor was satisfied beyond a reasonable doubt by "overwhelming and uncontested evidence . . . that Reynolds' murder was committed in an especially heinous and depraved manner." *Id.* The evidence established that Reynolds was helpless ("unarmed and outnumbered" by two armed captors), the murder was senseless (unnecessary to Petitioner's goal of "teaching Reynolds a lesson"), and that Petitioner mutilated Reynolds' body. *Id.* at 32-33, 97 P.3d at 857-58. The court concluded "beyond a reasonable doubt that the State established the (F)(6) aggravator and that no rational jury would have found differently." *Id.* at 33, 97 P.3d at 858.

The court next considered "whether reversible error occurred with respect to the mitigating circumstances." *Id.* The court first noted that Petitioner had objected to the introduction of any mitigating evidence on his behalf. *Id.* at 33-34, 97 P.3d at 858-59. It then reviewed the mitigation arguments defense counsel presented in his sentencing memorandum and the mitigating evidence the trial court received from the State. *Id.*

The court then assessed Petitioner's evidence concerning A.R.S. § 13-703(G)(1), which provides a mitigating circumstance where "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Like the trial court, the supreme court found the factor had not been proved:

> The trial court noted that some evidence supported a finding of the statutory mitigating factor under A.R.S. § 13-703(G)(1), but found that this factor had not been proven by a preponderance of the evidence. . . .

Generally, drug ingestion or intoxication are insufficient to establish the (G)(1) mitigating circumstance. Instead, the defendant must establish a causal nexus between the drug use and the offense, typically through the presentation of an expert witness. But "a defendant's claim of alcohol or drug impairment fails when there is evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior."

Here, the trial court observed that Murdaugh evinced various paranoid thoughts. The major feature of that paranoia was the belief that the government had placed a tracking device in his head. The court concluded that when viewed in light of Murdaugh's long history of methamphetamine use, such paranoid delusions were likely secondary to Murdaugh's chronic drug use. In addition, Dr. Gina Lang, whom the State called during the sentencing hearing, testified that Murdaugh suffered from a personality disorder and that his methamphetamine use *may* have amplified the antisocial tendencies of this disorder.

On the other hand, the court stated that Murdaugh's paranoid delusion about a perceived threat from the government was not the impetus for his kidnapping and murder of Reynolds. Moreover, "[t]he industry and thought, manifested over an extended period of time, which went into the murder of David Reynolds belies a finding that [Murdaugh] was significantly impaired." The court found that this clarity of thought was further demonstrated by the actions Murdaugh took after he injured himself while cleaning his horse's hooves. Murdaugh had the presence of mind to seek treatment at the nearest hospital for the injury to his leg. Consequently, the court concluded that the record did not establish by a preponderance of the evidence that Murdaugh's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

Further, uncontroverted evidence in the record reveals that Murdaugh took steps to avoid detection. First, during the kidnapping, he attempted to remove all fingerprints from Reynolds' van and to dispose of the van. Second, after the murder, he ordered Rohrs to clean up the blood in his garage. Third, he took Reynolds' body into the forest where he dismembered it in an effort to keep authorities from identifying the body. Fourth, when he discovered that the authorities were tracking the calls he made from Reynolds' cell phone, Petitioner destroyed the phone and disposed of the pieces.

Finally, because Murdaugh elected to waive mitigation, he did not present any expert testimony to establish that his ability to control his behavior or appreciate the wrongfulness of his conduct was significantly impaired. As a result, he failed to establish a causal connection between his methamphetamine use and his actions. Because of the complete lack of evidence of a causal connection between Murdaugh's drug use and the murder, we conclude beyond a reasonable doubt that no rational jury would have found that Murdaugh established the (G)(1) mitigating circumstance. This conclusion is bolstered by the undisputed evidence that Murdaugh made numerous efforts to avoid detection.

*Id.* at 34-35, 97 P.3d at 859-60 (citations omitted).

The court proceeded to examine the nonstatutory mitigating circumstances found by the trial court. *Id.* at 35, 97 P.3d at 860. The court noted that while the trial court was required to and did consider all relevant evidence offered in mitigation, it did not give the nonstatutory mitigating circumstances significant weight, and ultimately determined that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances and call for leniency. *Id.* The supreme court then reviewed the mitigating circumstances to determine "whether a jury could have weighed these mitigating factors differently than did the trial judge." *Id.* The court, citing with approval the trial judge's analysis, offered the following evaluation of Petitioner's nonstatutory mitigation:

> The trial court first found that the evidence proffered in support of the (G)(1) mitigating circumstance also supported a finding of the following non-statutory mitigating circumstances: 1) impairment from the use of crystal methamphetamine at the time of the offense; 2) impairment from chronic drug use; 3) personality disorder; 4) paranoid thoughts; and 5) potential impact of all four on Murdaugh's mental abilities. Nonetheless, the court accorded these factors little weight.

> The reports prepared by Drs. Sindelar, Potts, and Scialli do reveal that Petitioner experienced certain paranoid thoughts and delusions that were likely exacerbated by his history of chronic methamphetamine use. But because no mental health professional found a causal nexus between these conditions and the murders . . . we find beyond a reasonable doubt that no rational jury would have weighed those factors any differently than did the trial judge.

> Second, the trial court found evidence of the following additional non-statutory mitigation: cooperation with law enforcement; lack of prior criminal convictions; and desire to spare his family and victim's family from trial. We examine each of these findings in turn.

> The trial court concluded that Murdaugh's cooperation with law enforcement was a mitigating circumstance, but the court did not give that circumstance much weight. Murdaugh did agree to voluntarily answer questions when he was approached by Detective Griffiths at the hospital. Before he answered any questions, however, Murdaugh first asked whether his garage had been cleaned. Detective Griffiths responded that it had not been cleaned, to which Petitioner replied that they "had enough to do [him] in." Murdaugh then described the events surrounding Reynolds' murder. Murdaugh also provided Detective Griffiths with a detailed map and directions to his campsite and to where he buried Reynolds' body and personal effects. From this sequence of events, it is clear that Murdaugh's cooperation came only after he learned that Rohrs had not cleaned up the garage. We therefore conclude that no reasonable jury would have given Murdaugh's cooperation more weight than did the trial court.

The trial court next found that Murdaugh's lack of prior criminal history was a mitigating circumstance, but the court did not place much weight on this factor. Similarly, in light of the nature and strength of the aggravating factors, we find that a jury hearing such evidence would not place more than minimal weight on this mitigating circumstance.

The trial court also found that Murdaugh's decision to spare his family and the victim's family from the pain of a trial was a mitigating circumstance. Murdaugh admitted his guilt and told Dr. Potts that he did not wish to put his family through the pain of a trial. The trial court gave "this factor little weight." We agree with the trial court and conclude beyond a reasonable doubt that a rational jury would have placed minimal weight on this circumstance.

*Id.* at 35-36, 97 P.3d at 860-61.

The court also rejected as unsupported Petitioner's arguments that the sentencer could have found additional mitigating circumstances, including the allegation that Petitioner offered Reynolds food and a pillow while he was locked in the trunk, opened the trunk when Reynolds complained of claustrophobia, and kidnapped Reynolds out of a desire to protect his girlfriend's honor. *Id.* at 36-37, 97 P.3d at 861-62.

The Arizona Supreme Court concluded its harmless error review as follows:

The unchallenged evidence in this case leaves no question that Murdaugh murdered Reynolds in an especially heinous and depraved manner and that he had a prior conviction for which he received a life sentence. The circumstances of this murder, coupled with Murdaugh's mutilation of Reynolds' body, "clearly sets [this murder] apart from the norm of first degree murders." *Sansing,* 206 Ariz. at 241, ¶ 38, 77 P.3d at 39. Moreover, the mitigating evidence is so minimal that we conclude beyond a reasonable doubt that a jury would not have weighed the evidence of mitigation differently than did the trial judge. Thus, we hold that any *Ring II* error was harmless.

*Id.* at 37, 97 P.3d at 862.

Petitioner contends that the court's harmless error review was unreasonable. In support of this proposition he cites other cases in which the Arizona Supreme Court determined that the *Ring* error was not harmless and remanded the cases for jury resentencing. (Doc. 35 at 97-111.) Petitioner also argues that the state court's harmless error analysis was contrary to and an unreasonable application of United States Supreme Court precedent. (*Id.* at 111-18.)

Petitioner is entitled to relief on this aspect of Claim 1 only if the Arizona Supreme

Court "applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-77 (2003)); *see Fry v. Pliler*, 551 U.S. 112, 119 (2007) ("under *Esparza,* a federal court cannot award habeas relief under Section 2254 "unless *the harmlessness determination itself* was unreasonable"). He is not entitled to relief if the state court "simply erred" in concluding that the *Ring* error was harmless. *Id.*

To the extent that it is based on a comparison with the analyses undertaken by the court in other cases, Petitioner's critique of the Arizona Supreme Court's application of harmless error review in his case is unavailing. The fact that the court did not find *Ring* error harmless in other cases, each of which involved distinct facts and unique combinations of aggravating and mitigating circumstances, does not demonstrate that the same court's ruling in Petitioner's case was objectively unreasonable.

Petitioner criticizes the court's assessment of the mitigating evidence, particularly information concerning Petitioner's drug abuse. This criticism is unwarranted. First, *Ring II* held only that a jury must determine the aggravating factors in a capital case that render a person eligible for the death penalty; it did not require jury determination of the ultimate sentence. Therefore, the Arizona Supreme Court's review of *Ring* error was complete when it determined beyond a reasonable doubt that no rational jury would have found that the two aggravating factors had not been proved. *Cf. Butler v. Curry*, 528 F.3d 624, 648-49 (9th Cir. 2008) (reviewing *Apprendi* violation for harmless error by asking whether jury would have found aggravating factor rendering defendant eligible for increased sentence). Moreover, the court's review of the mitigating evidence, while not required by *Ring II*, was thorough, and its assessment of the evidence was not objectively unreasonable. The record clearly supported the two strong aggravating factors found by the trial court, while the mitigating circumstances presented at sentencing, to the extent Petitioner allowed them to be offered, were relatively weak and not supported by evidence concerning the circumstances of the crime.

Petitioner also asserts that the court improperly imposed a causal nexus on its consideration of the mitigating evidence. The Court addresses this allegation in Claim 3 below.

Conclusion

The Arizona Supreme Court properly found that *Ring* error is subject to harmless error analysis. The court's application of this standard to Petitioner's capital sentence does not entitle Petitioner to habeas relief. Claim 1 is therefore denied.

**(2)    Claim 2**

Petitioner alleges that his guilty pleas were not knowing, intelligent, or voluntary because the trial court failed to inform him of his right to a jury determination of his sentence. (Doc. 35 at 119.) Respondents contend that only the Sixth Amendment aspect of this claim is properly exhausted. (Doc. 38 at 77.) Regardless of its procedural status, the claim lacks merit and will be denied.

On direct appeal, Petitioner argued that his decision to plead guilty may have been different if he had known of his right to be sentenced by a jury. The Arizona Supreme Court rejected this argument. First, the court explained that

> at the time Murdaugh entered into his plea agreement, there was no Sixth Amendment right to sentencing by jury. *See Ring II,* 536 U.S. at 589, 122 S. Ct. 2428. But even if there had been such a right, a jury would have considered the same evidence as did the trial judge in deciding whether to impose the death penalty. Consequently, Murdaugh is unable to show how the subsequent decision by the Supreme Court in *Ring II* affected his tactical decision to plead guilty to first degree murder.

*Murdaugh*, 209 Ariz. at 28, 97 P.3d at 853.

The court also explained that "*Ring II* impacted only the identity of the trier of fact at sentencing, not the process itself," that "Murdaugh had ample opportunity to present evidence relevant to the sentencing determination," and therefore "the change brought about by *Ring II* could not have had any significant impact on Murdaugh's tactical decision to plead guilty." *Id.* In addition, the court, citing *Brady v. United States*, 397 U.S. 742 (1970), held that "the fact that there was a change in the law subsequent to Murdaugh's guilty plea

does not necessarily render his plea involuntary." *Id.* at 29, 97 P.3d at 854. The court concluded that "nothing in this record indicates that Murdaugh's decision to plead guilty was influenced by whether a judge or a jury would decide if he deserved to be sentenced to death." *Id.*

Petitioner contends that "the state court erred when it found that there was no Sixth Amendment right to jury sentencing at the time of Murdaugh's pleas." (Doc. 35 at 122.) He argues that in *Ring II* the United States Supreme Court "found that the right to a jury determination had always existed." (*Id.*) In support of this proposition he cites a passage in *Ring II*, 536 U.S. at 599, quoting from Justice Stevens' dissent in *Walton v. Arizona*, 497 U.S. 639, 709 (1990). Petitioner's argument is unpersuasive.

In *Walton*, the Court upheld Arizona's capital sentencing scheme, explaining that "[a]ny argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." *Id.* at 647-48 (quoting *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990)); *see Apprendi*, 530 U.S. at 496 ("this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death") (citing *Walton*, 497 U.S. at 647-49)). The Court did not overrule *Walton* until *Ring II*, 536 U.S. at 609, decided in 2002, more than two years after Petitioner pled guilty in January 2000. It is clear that before *Ring II*, and certainly at the time of Petitioner's pleas, the United States Supreme Court had not yet recognized a right to a jury determination of aggravating factors rendering a defendant death-eligible.[10]

---

[10]     Following *Ring II*, Arizona amended its capital sentencing statute to provide for jury determination of both aggravating factors and the ultimate sentence. Under A.R.S. § 13-703.01.D (Supp. 2002), "the jury will find and consider the effect of aggravating and mitigating circumstances and decide whether the defendant should receive a sentence of death." *Ring III*, 204 Ariz. at 545, 65 P.3d at 926.

In addition, as the Arizona Supreme Court noted, even assuming the existence of such a right, Petitioner fails to articulate how the identity of the sentencer – jurors as opposed to a judge – would have affected his decision to plead guilty. While Petitioner suggests that he would not have pled guilty if he had known he had a right to be sentenced by a jury, he offers no reasoned support for this contention. Instead, he merely repeats his argument that a jury might have reached a different sentencing decision than the trial judge. Again, Petitioner does not explain the counterintuitive proposition that, faced with the possibility of a more lenient sentence imposed by a jury, he would have been less likely to plead guilty.

The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law. Claim 2 is denied.

**F.** **_Tennard_ Error: Claim 3**

Citing _Tennard v. Dretke_, 542 U.S. 274, 289 (2004), Petitioner alleges that his right to an individualized sentencing determination was violated when the trial court and the Arizona Supreme Court employed a causal nexus test to avoid giving effect to his mitigating evidence. (Doc. 35 at 124.) Respondents concede that Petitioner properly exhausted this claim. (Doc. 38 at 84.)

Petitioner also alleges that appellate counsel was ineffective for failing to include this issue on appeal. (Doc. 35 at 124, 135.) Respondents contend that Petitioner failed to raise his claim of appellate ineffective assistance in his petition for review to the Arizona Supreme Court. (Doc. 38 at 84.) It is unnecessary to address this procedural dispute because, as set forth below, Petitioner's claim of _Tennard_ error is without merit. Therefore, Petitioner was not prejudiced by counsel's failure to raise the issue on appeal, and his claim of ineffective assistance of appellate counsel must fail.

Background

At sentencing the court found that the State had proved two aggravating factors. RT 11/16/01 at 20-34. Notwithstanding Petitioner's waiver of mitigation, the trial court reviewed the Rule 11 reports of Drs. Potts, Scialli, and Sindelar, and considered the portion

of Dr. Lang's testimony that provided mitigating evidence. *Id.* at 35. As already noted, at Petitioner's request the court did not consider the reports of Drs. Shaw and Deming or the mitigation report prepared by Linda Christianson. RT 9/28/01 at 37-41; ME 240 at 3-4.

The court first considered statutory mitigation, specifically the factor set forth in A.R.S. § 13-703(G)(1), that Petitioner's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law was significantly impaired. RT 11/16/01 at 35-38. The court found that Petitioner had not proven this factor:

> The record indicates that the defendant has evinced various paranoid thoughts. The major paranoid thought feature was a tracking device was placed in his head allowing the CIA to track his whereabouts.
>
> The record establishes that the defendant has a long history of chronic drug abuse. It may be that the paranoid delusions are secondary to the chronic abuse of methamphetamine.
>
> The testimony of Dr. Gina Lang indicates that the defendant may suffer from a personality disorder and that the consumption of methamphetamine may have amplified the characteristics of the defendant's anti-social personality disorder.
>
> The Court has considered individually and collectively that the defendant was under the influence of drugs at the time of the offense, that the defendant was a chronic drug abuser, that the defendant has a personality disorder, and that the defendant experiences paranoid thoughts.
>
> The Court has also considered the totality of the circumstances surrounding the murder of David Reynolds. The industry and thought, manifested over an extended period of time, which went into the murder of David Reynolds belies a finding that the defendant was significantly impaired.
>
> The defendant arranged for David Reynolds to be lured to the defendant's home. The defendant imprisoned the victim over an extended time and then murdered him. The defendant elaborately dismembered and disposed of the victim's body.
>
> Paranoid thoughts appeared to have played no part in the abduction of the victim, the murder of the victim, or the secretion of the victim's body.
>
> After disposing of the body the defendant injured himself while tending to his horse. The defendant was able to notify hospital authorities and drive himself for medical care. The extensive industry and clarity of thought in the entire episode belies a finding that the defendant was so significantly impaired so as to constitute the statutory mitigating factor.

*Id.* at 37.

Turning to nonstatutory mitigation, the court found that eight mitigating circumstances

had been proved: Petitioner was under the influence of drugs at the time of the offense; he was a chronic drug abuser; he had a personality disorder; he experienced paranoid thoughts; the combination of those four circumstances may have impacted his mental abilities; he cooperated with law enforcement; he lacked a prior criminal record; and he pled guilty in order to spare his family and the victim's family the ordeal of a trial. *Id.* at 38-39. However, although the court found that these circumstances had been proved, it gave each factor "little weight." *Id.* at 38-40. The court determined that the two aggravating factors were of "great weight" and that "[t]aken together, all of the mitigating factors are of little weight" and "cumulatively . . . not sufficiently substantial to call for leniency." *Id.* at 40.

As discussed above, the Arizona Supreme Court, reviewing Petitioner's death sentence for harmless error, assessed the evidence and agreed with the trial court that the (G)(1) factor was not proved and that the nonstatutory mitigating evidence was entitled to little weight. *Murdaugh*, 209 Ariz. at 34-36, 97 P.3d at 859-61. In making these determinations the court noted that Petitioner, "because [he] elected to waive mitigation," "failed to establish a causal connection between his methamphetamine use and his actions," and therefore "no rational jury would have found that Murdaugh established the (G)(1) mitigating circumstance." *Id.* at 35, 97 P.3d at 860. With respect to nonstatutory mitigating circumstances, the court again noted that "no mental health professional found a causal nexus between these conditions [i.e., Petitioner's drug abuse, paranoia, and personality disorder] and the murders." *Id.* Therefore, "no rational jury would have weighed these factors any differently than did the trial judge." *Id.*

In his PCR petition, Petitioner raised a claim of *Tennard* error, arguing that the trial court, following precedent from the Arizona Supreme Court, applied an invalid nexus test to its consideration of Petitioner's mitigating evidence. (Doc. 31, Ex. 39 at 24-26.) The PCR court rejected the claim as not colorable, finding that it was contradicted by the record, which showed that "[t]he trial court found defendant's mental state and methamphetamine addiction at the time of the crime to be mitigating circumstances, but did not afford them weight

sufficient for leniency." (Doc. 32, Ex. 99 at 6.) The court continued: "The fact that the trial court did not find that the mitigating factors did not [sic] mandate a life sentence was not unconstitutional." (*Id.*)

As explained below, this ruling was neither contrary to nor an unreasonable application of United States Supreme Court precedent.

Analysis

Once a determination is made that a person is eligible for the death penalty, the sentencer must consider relevant mitigating evidence, allowing for "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and mental problems] may be less culpable than defendants who have no such excuse." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Therefore, the sentencer in a capital case is required to consider any mitigating information offered by a defendant, including nonstatutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (right to individualized sentencing in capital cases violated by Ohio statute that permitted consideration of only three mitigating factors); *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982) (*Lockett* violated where state courts refused as a matter of law to consider mitigating evidence that did not excuse the crime). In *Lockett* and *Eddings*, the Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*,

149 F.3d 923, 943 (9th Cir. 1998); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence). As the *Eddings* court explained: "The sentencer . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 114-15.

In its analysis of Claim 3, the court takes several principles into account. First, the Supreme Court has held that if a death penalty scheme provides rational criteria for eligibility and no limitation on the consideration of relevant circumstances that could mitigate against a death sentence, then "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Romano v. Oklahoma*, 512 U.S. 1, 7 (2004) (quoting *Blystone v. Pennsylvania*, 494 U.S. 299, 309 (1990)). The Supreme Court has emphasized that there is no required formula for weighing mitigating evidence, and the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant v. Stephens*, 462 U.S. 862, 875 (1983); *see Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here."); *Harris v. Alabama*, 513 U.S. 504, 512 (1995) (Constitution does not require that a specific weight be given to any particular mitigating factor); *Tuilaepa*, 512 U.S. at 979-80.

Conversely, while the sentencer in a capital case may be afforded unbridled discretion in considering the appropriate sentence, "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable

administration of the death penalty.'" *Boyde v. California*, 494 U.S. 370, 377 (1990) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988) (plurality opinion)); *see Johnson v. Texas*, 509 U.S. 350, 362 (1993). The Supreme Court has explained that "*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *Johnson*, 509 U.S. at 361-62 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456 (1990) (Kennedy, J., concurring in judgment)). Thus, "[a]lthough *Lockett* and *Eddings* prevent a State from placing relevant mitigating evidence 'beyond the effective reach of the sentencer,' *Graham v. Collins*, [506 U.S. 461, 475 (1993)], those cases and others in that decisional line do not bar a State from guiding the sentencer's consideration of mitigating evidence." *Id.* at 362; *see Saffle v. Parks*, 494 U.S. 484, 492-93 (1990) (holding that an instruction directing the jury to avoid any influence of sympathy when imposing sentence did not violate *Lockett* and *Eddings* and noting the "distinction between allowing the jury to consider mitigating evidence and guiding their consideration"); *California v. Brown*, 479 U.S. 538, 545 (1987).

Finally, on habeas review a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the record to ensure that the state court allowed and considered all relevant mitigating information. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007), *cert. denied*, 552 U.S. 1224 (2008) (rejecting claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant). As the Ninth Circuit explained in *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir. 1998), rejecting the petitioner's argument

that the state courts failed to consider the mitigation evidence "fully":

> federal courts do not review the imposition of the sentence *de novo*. Here, as in the state courts' finding of the existence of an aggravating factor, we must use the rational fact-finder test of *Lewis v. Jeffers*. That is, considering the aggravating and mitigating circumstances, could a rational fact-finder have imposed the death penalty?

The court reiterated that such a determination takes into account the strength of the aggravating factors, which, in *LaGrand*, included pecuniary gain and a murder committed in an especially cruel, heinous, or depraved manner. *Id.*

Applying these principles, it is apparent in Petitioner's case that the trial court and the Arizona Supreme Court fulfilled their constitutional obligation by allowing and considering all of the mitigating evidence, and that the PCR court reasonably applied clearly established federal law to Petitioner's *Tennard* claim.

In *Tennard*, the Supreme Court revisited Texas's capital sentencing procedure, which it had addressed in several previous cases, including *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*), and *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*). The sentencing procedure at issue required the jury to answer three special questions: whether the conduct of the defendant was deliberate and committed with the reasonable expectation that death would result; whether there is a reasonable probability that the defendant would commit further acts of violence that would constitute a continuing threat to society; and, if raised by the evidence, whether the defendant's conduct was unreasonable in response to any provocation by the deceased. *Penry I*, 492 U.S. at 310. If the jury answered each question affirmatively, the court must sentence the defendant to death. *Id.*

In *Penry I*, the Supreme Court held that this "special issues" scheme violated the Eighth Amendment by failing to allow jurors to give full effect to evidence of the defendant's mental retardation and childhood abuse. *Id.* at 319-28. The Court explained that in the context of the special issues, Penry's mental retardation had relevance beyond the issue of the deliberateness of the crime and, with respect to future dangerousness, would be viewed as aggravating rather than mitigating evidence, in that it suggested Penry would be unable

to learn from his mistakes. *Id.* at 322-23. In *Penry II*, the Court held that the defects in Texas' sentencing scheme were not cured by a supplemental instruction directing the jury to consider and weigh mitigating circumstances and stating that jurors could answer no to a special issue if they believed that a life sentence was appropriate. 532 U.S. at 789-90. The Court found that the instruction failed to address the fact that "none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse." *Id.* at 798. Also, because such evidence did not fit within the scope of the special issues, "answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction." *Id.* at 799-800.[11]

In *Tennard*, the petitioner was sentenced to death after the jury provided affirmative answers to the deliberateness and future dangerousness special issues. The district court denied Tennard's federal habeas petition in which he claimed that his death sentence violated the Eighth Amendment as interpreted in *Penry*, and denied a certificate of appealability. The Fifth Circuit agreed that Tennard was not entitled to a certificate of appealability. *Tennard v. Cockrell*, 284 F.3d 591 (5th Cir. 2002). Its decision was based on the circuit court's application of a threshold test for the constitutional relevance of mitigating evidence, according to which relevant mitigating evidence is evidence of a "uniquely severe permanent handicap" that bore a "nexus" to the crime. *Id.* at 595. The court concluded that low IQ evidence alone does not constitute a uniquely severe condition. *Id.* at 596. The court also determined that even if Tennard's low IQ amounted to mental retardation evidence, he failed to show that his crime was attributable to his mental capacity. *Id.* at 597-97.

The Supreme Court reversed, holding that Tennard was entitled to a certificate of appealability with respect to the district court's denial of his *Penry* claim. *Tennard*, 542 U.S.

---

[11] In *Brewer v. Quarterman*, 550 U.S. 286 (2007), and *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), the Supreme Court again found that the Texas special issues framework, without an additional instruction on mitigating evidence, did not allow juries to give effect to evidence of mental illness, an abusive childhood, and substance abuse.

at 289.  In doing so, the Court rejected the Fifth Circuit's "screening test," explaining that "impaired intellectual functioning is inherently mitigating."  *Id.* at 287 (quoting *Atkins v. Virginia*, 536 U.S. 304, 316 (2002)).  The Court stated that the relevance of "low IQ evidence" does not depend on a "nexus" between the evidence and the crime, and concluded that "we cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence – and thus that the *Penry* question need not even be asked – unless the defendant also establishes a nexus to the crime."  *Id.*  In *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (per curiam), the Court again rejected the causal nexus screening test, this time as it was applied by the state appellate court in finding evidence of Smith's low IQ and troubled childhood irrelevant for mitigation purposes.

In *Tennard* the Supreme Court condemned the circuit's ruling because it barred review of whether the Texas special issues framework could give full effect to relevant mitigating evidence proffered by Tennard.  The holding in *Tennard* does not entitle Petitioner to relief because Arizona law did not impose any such barrier to consideration of Petitioner's mitigating evidence.

As an initial matter, Arizona's death penalty statute, unlike the special issues framework in Texas, explicitly provides for the type of review mandated by *Lockett* and *Eddings*:

> Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following [enumerated statutory mitigating factors].

A.R.S. § 13-703(G)(1).[12]  Arizona's sentencing statute thus establishes a framework for the

---

[12]  Prior to *Lockett*, Arizona's death penalty statute, A.R.S. § 13-454, enumerated certain mitigating factors but did not contain a catch-all provision.  In *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), the Arizona Supreme Court held that § 13-454, with its restriction on the consideration of mitigating factors outside those specified in the statute, did not satisfy *Lockett*.  Shortly after *Watson*, the Arizona legislature amended the mitigation portion of the death penalty statute to conform with *Lockett* by requiring the sentencer in a capital case to consider any relevant mitigating information. A.R.S. § 13-703(G).

consideration of mitigating evidence far less restrictive than that provided by the special issues system that was the subject of *Tennard*, *Penry*, and *Johnson*.

Because the statute mandates the consideration of any relevant mitigating evidence, the only question is whether an Arizona court violates *Lockett* and *Eddings* by applying a causal connection test to their consideration of certain types of mitigating evidence. The Court concludes that it does not. Instead, Arizona's nexus test is a permissible means of guiding a sentencer's discretion in considering and weighing mitigating evidence.

Petitioner's contention is that the Arizona courts, by way of the causal nexus test, impermissibly limited the manner in which his mitigating evidence was considered. However, because the state courts did not altogether prevent the sentencer from considering and weighing Petitioner's mitigating evidence, *Lockett* and *Eddings* were not violated.

The state courts did not give the proffered mitigating evidence "no weight *by excluding such evidence from their consideration*." *Eddings*, 455 U.S. at 114-15 (emphasis added). Petitioner's "mitigating evidence was not placed beyond the [sentencer's] effective reach," nor was the "sentencer . . . precluded from even considering certain types of mitigating evidence." *Johnson*, 509 U.S. at 366. Simply put, the state courts did not exclude any mitigating evidence. *See Skipper v. South Carolina*, 476 U.S. 1, 8-9 (1986) (*Lockett* and *Eddings* violated when trial court excluded as irrelevant testimony from jailer regarding defendant's positive adjustment to incarceration); *Davis v. Coyle*, 475 F.3d 761, 771-73 (6th Cir. 2007) (*Lockett* and *Eddings* violated when resentencing court disallowed relevant evidence of good behavior in prison); *Jones v. Polk*, 401 F.3d 257, 262-64 (4th Cir. 2005) (violation where court excluded testimony that defendant had expressed remorse). To the contrary, as illustrated above, the sentencing court and the Arizona Supreme Court were afforded "full access" to the available mitigation information, *Marsh*, 548 U.S. at 174, which they carefully analyzed and weighed.

The trial court and the state supreme court thoroughly discussed the mitigating circumstances presented at sentencing, including Petitioner's mental health and substance

abuse. The fact that the courts accorded these factors little weight does not amount to a constitutional violation under *Lockett* and *Eddings*. *Ortiz*, 149 F.3d at 943; *Ceja*, 97 F.3d at 1251; *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) ("Although Atkins argues that the trial judge did not *consider* nonstatutory factors, it is more correct to say that the trial judge did not *accept* – that is, give much weight to – Atkins' nonstatutory factors. Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors."); *State v. Mata*, 185 Ariz. 319, 331 n.6, 916 P.2d 1035, 1047 (1996) ("Defendant seems to believe that a trial court only 'considers' mitigating evidence if it imposes a mitigated sentence. The law is to the contrary. So long as the trial court considers the evidence, the judge is not bound to conclude that the evidence calls for leniency.").

The court is simply unaware of any support for the proposition that mitigating evidence, once admitted and under consideration, is entitled to any specific weight. *See, e.g.*, *Allen v. Buss*, 558 F.3d 657, 667 (7th Cir. 2009) ("The rule of *Eddings* is that a sentencing court may not exclude relevant mitigating evidence. But of course, a court may choose to give mitigating evidence little or no weight.") (internal citations omitted); *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007) (jurors in capital sentencing are "obliged to consider relevant mitigating evidence, but are permitted to accord that evidence whatever weight they choose, including no weight at all"); *Schwab v. Crosby*, 451 F.3d 1308, 1329-30 (11th Cir. 2006) ("The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.").

The court is likewise unaware of any precedent holding that it is inappropriate for a sentencer, when weighing mitigating evidence concerning a defendant's background, substance abuse, or mental health, to consider the extent to which the evidence offers an explanation of his criminal conduct. *Cf. Allen v. Woodford*, 395 F.3d 979, 1005-10 (2005)

(noting that mitigating evidence may serve both a "humanizing" and an "explanatory" or "exculpatory" purpose, with greater weight generally being ascribed to the latter category).

The Ninth Circuit has addressed the *Tennard* issue in two recent cases: *Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2009) (per curiam), *cert. denied*, 130 S. Ct. 379 (2009); and *Schad v. Ryan*, 595 F.3d 907 (9th Cir. 2010) (per curiam), *opinion amended and superseded on denial of rehearing en banc*, No. 07-99005, 2010 WL 2197424. In *Styers*, the Arizona Supreme Court struck one of the aggravating factors found by the sentencing court, then reweighed the remaining aggravating factors against the mitigating circumstances. *State v. Styers*, 177 Ariz. 104, 117, 865 P.2d 765, 777 (1993). In affirming the death sentence, the court stated that evidence Styers suffered from post-traumatic stress disorder did not "constitute mitigation" because Styers could not connect his condition to his behavior at the time of the crimes. *Id.* The Ninth Circuit held that the Arizona Supreme Court "appears" to have imposed an improper nexus test, which resulted in a failure to consider the mitigating evidence in violation of *Smith* and *Eddings*. *Styers*, 547 F.3d at 1035-36. In *Schad*, by contrast, the Ninth Circuit found no such violation because the state courts did not "refuse[] to consider any evidence Schad offered"; the courts did not "exclude[] mitigation evidence" and "the record shows that the sentencing court did consider and weigh the value" of the mitigating evidence. 595 F.3d at 926. The Court of Appeals noted that the trial court weighed evidence concerning Schad's childhood but found it was not "a persuasive mitigating circumstance" and the Arizona Supreme Court "conducted an independent review of the entire record regarding the aggravating and mitigating factors." *Id.*

In Petitioner's case, the record clearly shows that the trial court did not exclude or refuse to consider any mitigating evidence. The court did not state that the lack of a causal connection foreclosed consideration of the evidence or that such evidence could not "constitute" mitigation. To the contrary, the court not only considered all of the evidence but found that several non-statutory mitigating circumstances had been proven. The Arizona Supreme Court considered the aggravating and mitigating circumstances in carrying out its

harmless error review of Petitioner's death sentence. *Murdaugh*, 209 Ariz. at 29-36, 97 P.3d at 854-61. In doing so the court considered and evaluated all of the statutory and nonstatutory mitigating circumstances to determine whether a jury would have reached a different sentencing decision than the trial judge. *Id.* at 33-37, 97 P.3d at 858-62. The court cited the lack of a nexus between the mitigating circumstances and the crime simply as one of the criteria by which a jury would have weighed the mitigating information. *Id.* at 35-37, 97 P.3d at 860-62.

While *Tennard* and *Smith* invalidated the use of a causal connection test as a screening mechanism that excludes consideration of relevant mitigating evidence, they did not address the legitimacy of such a test as a means of guiding the sentencer's discretion or assessing the weight of mitigating evidence. This court concludes that Arizona's causal nexus test provides a rational standard by which to "structure and shape consideration of mitigating evidence." *Johnson*, 509 U.S. at 362. It is difficult to conceive that a violation of *Lockett* and *Eddings* occurs when a sentencing judge in Arizona, having admitted and considered all proffered mitigating evidence as required by statute, and having determined moreover that a number of mitigating circumstances had been proved, takes into account the relationship between the circumstances and the crime when determining the appropriate sentence.

The PCR court's rejection of Petitioner's *Tennard* claim was a reasonable application of clearly established federal law. Claim 3 is denied.

## G.    Miscellaneous Claims: Claims 17-20

Petitioner challenges the timing and method of his execution, asserts that the clemency process will be unfair, and alleges that he is entitled to relief based on the cumulative errors surrounding his guilty plea and sentencing. For the reasons set forth below, these claims will be denied.

### (1)    Claim 17

Petitioner asserts that the inordinate length of time he will have spent in prison before he is executed amounts to cruel and unusual punishment. (Doc. 35 at 255.) Respondents

contend that the claim is procedurally barred. (Doc. 38 at 176-77.) It is unnecessary to address the claim's procedural status because it is plainly meritless.

The United States Supreme Court has never held that lengthy incarceration prior to execution constitutes cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 129 S. Ct. 1299 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue). Circuit courts, including the Ninth Circuit, have also held that prolonged incarceration under a sentence of death does not violate the Eighth Amendment. *See McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995). It is ironic that Petitioner complains of delay and at the same time criticizes the court for imposing a reasonable schedule in this case. (*See* Doc. 35 at 2-4.) Claim 17 is not supported by clearly established federal law and therefore Petitioner is not entitled to habeas relief.

> **(2)   Claim 18**

Petitioner asserts that his right not to be subjected to cruel and unusual punishment will be violated by the State of Arizona's use of lethal injection to carry out his death sentence. (Doc. 35 at 270.) Respondents concede that the claim is exhausted.

The United States Supreme Court has never held that lethal injection constitutes cruel and unusual punishment, *see Baze v. Rees*, 128 S. Ct. 1520 (2008), and the Ninth Circuit has concluded that death by lethal injection in Arizona does not violate the Eighth Amendment. *See LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094, 1104-05 (9th Cir. 1997); *see also Dickens v. Brewer*, 07-CV-1770, 2009 WL 1904294 (D. Ariz. July 1, 2009) (Arizona's revised lethal injection protocol does not violate Eighth Amendment). Claim 18 is not supported by clearly established federal law and therefore Petitioner is not entitled to habeas relief.

### (3)    Claim 19

Petitioner asserts that he will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. (Doc. 35 at 282.)  Because Petitioner has not sought clemency, the claim is premature and not ripe for adjudication.  More significantly, the claim is not cognizable on federal habeas review.  Habeas relief can only be granted on a claim that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Petitioner's challenge to state clemency procedures does not constitute an attack on his detention and thus is not a proper ground for habeas relief.  *See Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal habeas law).

### (4)    Claim 20

Petitioner asserts that the numerous errors committed during his guilty plea and sentencing hearing cumulatively produced a fundamentally unfair proceeding and violated his due process rights and his right to be free from cruel and unusual punishment.  (Doc. 35 at 283.)  Respondents contend that the claim is procedurally defaulted and barred.  (Doc. 38 at 186.)  The Court agrees.  Petitioner did not raise a claim of cumulative error at any point during the proceedings in state court.  If he were to return to state court now, the claim would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to Arizona's rule of preclusion.  *See* Ariz. R.Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, Claim 20 is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.  Because Petitioner has established neither cause and prejudice nor a fundamental miscarriage of justice, Claim 20 is barred from this Court's review.

The claim is also meritless.  "Because there is no single constitutional error in this case, there is nothing to accumulate to the level of a constitutional violation."  *Mancuso v.*

*Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

## IV. EVIDENTIARY DEVELOPMENT

Petitioner seeks evidentiary development with respect to Claims 2-19. (Doc. 51.) Respondents oppose the request. (Doc. 52.) For the reasons set forth below, the court finds that Petitioner is not entitled to evidentiary development.

**A.** **Standards**

**(1)** **Discovery**

Rule 6(a) of the Rules Governing Section 2254 Cases provides that "[a] judge may, for *good cause*, authorize a party to conduct discovery under the Federal Rules of Civil Procedure, and may limit the extent of discovery." Rule 6(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (emphasis added). Thus, unlike the usual civil litigant in federal court, a habeas petitioner is not entitled to discovery "as a matter of ordinary course," *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see Campbell v. Blodgett*, 982 F.2d 1356, 1358 (1993), nor should courts allow him to "use federal discovery for fishing expeditions to investigate mere speculation," *Calderon v. United States Dist. Ct. for the N. Dist. of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (habeas corpus is not a fishing expedition for petitioners to "explore their case in search of its existence") (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)). Whether a petitioner has established "good cause" for discovery under Rule 6(a) requires a habeas court to determine the essential elements of the petitioner's substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

**(2)** **Evidentiary Hearing / Expansion of the Record**

Historically, the district court had considerable discretion to hold an evidentiary hearing to resolve disputed issues of material fact. *See Townsend v. Sain*, 372 U.S. 293, 312,

318 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254(e)(2); *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999); Rule 8, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the district court judge shall determine if an evidentiary hearing is required). That discretion is significantly circumscribed by § 2254(e)(2) of the AEDPA. *See Baja*, 187 F.3d at 1077-78.

Section 2254 provides that:

*If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –*

(A) the claim relies on –

(I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. A hearing is not barred, however, when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." *Id.*; *see Baja*, 187 F.3d at 1078-79 (allowing hearing when state court denied opportunity to develop factual basis of claim).

When the factual basis for a particular claim has not been fully developed in state court, the first question for a district court is whether the petitioner was diligent in attempting to develop the factual record. *See Baja*, 187 F.3d at 1078 (quoting *Cardwell v. Greene*, 152 F.3d 331, 337 (4th Cir. 1998)). The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information

available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney "fails" to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court. *See id*. at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002) (lack of diligence because petitioner knew of and raised claims of judicial bias and jury irregularities in state court, but failed to investigate all the factual grounds for such claims).

The petitioner bears the "burden of showing he was diligent in efforts to develop the facts supporting [his claims]." *Williams*, 529 U.S. at 440. Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir.) (finding no diligence because petitioner neither requested an evidentiary hearing in the trial court nor filed a state habeas petition), *amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001). The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003) (no effort to develop the record or assert any facts to support claim); *McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005) (no development of evidence available through himself, family members and literature, and no appeal of denial of funds and hearing); *Cannon v. Mullin*, 383 F.3d 1152, 1177 (10th Cir. 2004) (lack of diligence if petitioner does not proffer "evidence that would be readily available if the claim were true.").

In sum, if this court determines that Petitioner has not been diligent in establishing the factual basis for his claims in state court, then the court may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions. If, however, Petitioner has not

failed to develop the factual basis of a claim in state court, the court will then proceed to consider whether a hearing is appropriate or required under the criteria set forth by the Supreme Court in *Townsend*. 372 U.S. 293; *see Baja*, 187 F.3d at 1078 (quoting *Cardwell*, 152 F.3d at 337); *Horton, II v. Mayle*, 408 F.3d 570, 582 n.6 (9th Cir. 2005).

Pursuant to *Townsend*, a federal district court *must* hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding. *Townsend*, 372 U.S. at 312-13; *cf. Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Turner v. Calderon*, 281 F.3d 851, 890 (9th Cir. 2002) (petitioner entitled to an evidentiary hearing only if he alleges "facts that, if proven, would entitle him to relief") (quoting *Tapia v. Roe*, 189 F.3d 1052, 1056 (9th Cir. 1999)); *Bashor v. Risley*, 730 F.2d 1228 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations).

In any other case in which diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *Townsend*, 372 U.S. at 318. However, if a "habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the hearing." *Id.*

Rule 7 of the Rules Governing Section 2254 Cases authorizes a federal habeas court to expand the record to include additional material relevant to the petition. The purpose of Rule 7 "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." Advisory Committee Notes, Rule 7, 28 U.S.C. foll. § 2254; *see also Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977). When expansion of the record is sought, the court must assess whether the materials submitted are relevant to resolution of the petition.

Section 2254(e)(2), as amended by the AEDPA, limits a petitioner's ability to present new evidence through a Rule 7 motion to expand the record to the same extent that it limits the availability of an evidentiary hearing. *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (applying § 2254(e)(2) to expansion of the record when intent is to bolster the merits of a claim with new evidence) (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam)). Thus, when a petitioner seeks to introduce new affidavits and other documents never presented in state court, for the purpose of establishing the factual predicate of a claim, he must either demonstrate diligence in developing the factual basis in state court or satisfy the requirements of § 2254(e)(2)(A) & (B). However, when a petitioner seeks to expand the record for other reasons, such as to cure omissions in the state court record, *see Dobbs v. Zant*, 506 U.S. 357, 359 (1993) (per curiam), establish cause and prejudice, or demonstrate diligence, the strictures of § 2254(e)(2) do not apply. *See Boyko*, 259 F.3d 781, 790 (7th Cir. 2001).

**B.** **Discussion**

At the outset the court finds that evidentiary development is not appropriate for Claims 2 and 16-19 because they are record based, involve purely legal issues, or are plainly meritless. As the Supreme Court explained in *Landrigan*, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing. The Ninth Circuit has recognized this point in other cases, holding that 'an evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" 550 U.S. at 474 (quoting *Totten v. Merkle*, 137 F.3d 1172, 1176 (1998)). We next address Petitioner's request for evidentiary development with respect to the remaining claims.

**(1)** **Discovery**

Petitioner seeks to depose members of the defense team, including lead counsel (Lorona), co-counsel (Gitre and Claussen), the investigators (Salinas and Bachtle), the mitigation specialists (Wake and Christianson), and appellate counsel (Michael Reeves and

Michael Tafoya). He also seeks depositions from Drs. Potts, Sindelar, Scialli, Lang, and Deming; the prosecutor, Mark Barry; the trial judge, Judge Hutt; attorneys Mike Terribile, who testified at the PCR evidentiary hearing regarding funding issues, and Larry Hammond, who testified as a "*Strickland* expert"; individuals listed in Lorona's correspondence with the OCAC; and detention employees who had contact with Petitioner during his incarceration.

Petitioner requests the issuance of a subpoena for records from the OCAC relevant to the representation of Petitioner, including the contracts, billing records, payment records, and disciplinary records of trial and appellate counsel, as well as all correspondence between the OCAC and trial and appellate counsel; disciplinary records from the State Bar of Arizona for trial and appellate counsel; any documentation of communication, including but not limited to emails, letters, and phone calls between appellate counsel and any persons who may have worked with them on Petitioner's case; and disciplinary records from the State Bar of Arizona for Mark Barry and any other prosecutor involved in the sentencing phase of Petitioner's case.

Petitioner seeks a subpoena directed at the Office of the Maricopa County Attorney demanding "that the office produce its entire file relating to [Petitioner's case], or at least in regard to the presentation of mitigation or mitigation rebuttal, in order to discover evidence of the prosecutor's awareness of his divided loyalties and the level of preparation he took in preparing his mitigation presentation." (Doc. 51 at 78.) He also seeks a subpoena directed to the offices of Dr. Michael Bayless, Dr. Lang's employer at the time of her mitigation hearing testimony.

Finally, Petitioner seeks the issuance of interrogatories to appellate counsel requesting information concerning the staff who may have worked with them on Petitioner's case and anyone else who may have knowledge about their representation of Petitioner. He requests that interrogatories be issued to the prosecutor and Dr. Lang. He even requests a "direct interrogatory to the Arizona Supreme Court regarding what sealed evidence they did or did not review in determining mitigation." (Doc. 51 at 28-29.)

As noted, to determine whether good cause for discovery exists, the court must first determine the essential elements of Petitioner's substantive claims. *Bracy*, 520 U.S. at 908-09. Petitioner requests discovery with respect to Claims 2, 3, and 5-16. The court, having identified the elements of these claims above, must assess whether the requested discovery would lead to the development of facts that may entitle Petitioner to relief. *Id.* For the reasons set forth below, the Court finds that it would not.

Petitioner cannot show good cause with respect to much of the requested discovery because it is not relevant to his claims. *See Stephens v. Branker*, 570 F.3d 198, 213 (4th Cir. 2009) (petitioner's "discovery request is deficient because – although he has identified specific information sought – he has not demonstrated that such discovery would result in him being entitled to habeas relief on the conflict claim"). For example, in pursuing his ineffective assistance claims (Claims 4, 7, 8, 15, 16), Petitioner seeks trial and appellate counsel's bar records and records from the OCAC. However, counsel's conduct in other matters is not relevant to their performance during Petitioner's trial and appeal. In determining whether counsel's performance was deficient, the only issue is the reasonableness of counsel's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690; *see Babbit*, 151 F.3d at 1173-74. Therefore, the development of additional facts regarding counsel's past conduct in other cases cannot "show reason to believe" that Petitioner is entitled to relief on any of his ineffective assistance claims. *Bracy*, 520 U.S. at 908-09. The same analysis applies to Petitioner's conflict of interest claims (Claims 12 and 13). Petitioner cannot explain how additional information about the OCAC's funding situation is relevant to the issue of whether trial or appellate counsel labored under an actual, as opposed to a theoretical, conflict of interest. *Cf. Wallace v. Ward*, 191 F.3d 1235, 1245-46 (10th Cir. 1999) (district court did not abuse discretion in denying discovery where conflict of interest claims were general and conclusory).

Petitioner also fails to demonstrate that there are any contested facts the discovery of

which would bear on the merits of his claims. This is true with respect to Petitioner's request to depose Judge Hutt. The record is complete concerning the trial court's handling of Petitioner's guilty plea and waiver of mitigation (Claims 5 and 10). There are no contested facts underlying these "procedural incompetence" claims because the relevant facts about Petitioner's mental capacity were those in the judge's possession at the time she accepted his plea and waiver and upon which she was required to make her determination of competence. *Cf. Boyde v. Brown*, 404 F.3d 1159, 1165 n.6 (9th Cir. 2005) (citing *Davis v. Woodford*, 384 F.3d 628, 644-45 (9th Cir. 2004)). The same is true for the prosecutor and his presentation of evidence at the mitigation hearing (Claims 14-16); the only material facts are those found in the record of the hearing. The prosecutor had no duty to further investigate mitigating evidence, especially when Petitioner himself waived the presentation of any mitigation.

Petitioner's claims of ineffective assistance of appellate counsel (Claim 3, 7, 11, and 16) are likewise resolvable on the record. *See Gray v. Greer*, 800 F.2d 644, 647 (7th Cir. 1985) ("it is the exceptional case" where a claim of appellate ineffective assistance "could not be resolved on the record alone"). Moreover, because the underlying claims are without merit, Petitioner cannot establish prejudice notwithstanding any additional information discovered concerning the quality of appellate counsel's representation.

Petitioner's request for evidentiary development of Claim 3 through an interrogatory to the Arizona Supreme Court regarding what mitigating evidence the court considered is also denied. Such information is not relevant to Petitioner's claim that the court applied an unconstitutional nexus requirement to its review of Petitioner's capital sentence. Moreover, Petitioner has no right to invade the decision-making process of a court that is not otherwise of record.

A final consideration warrants a finding that Petitioner has not established good cause for his discovery requests, including his request to depose the defense team and various mental health and legal experts in support of his claims that he was incompetent to plead guilty and waive mitigation. Petitioner had the opportunity to gather this information in state

court during the PCR proceedings just two years ago. In fact, he previously deposed many of these individuals, who also testified at the evidentiary hearing, including Lorona, Gitre, Bachtle, Christianson, Wake, and Drs. Potts, Scialli, and Lang. Other individuals, such as jail employees, could have been deposed during the PCR proceedings. Under these circumstances, Petitioner cannot demonstrate good cause for additional discovery from the same individuals concerning the same issues. *See Smith v. Gibson*, 197 F.3d 454, 459 (10th Cir. 1999) (discovery may be inappropriate if the petitioner had an opportunity to conduct discovery and to develop evidence during the state post-conviction proceedings); *cf. Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997) (finding good cause for discovery existed "particularly given that there was never any hearing for the ineffective assistance claim at the state-court level").

Petitioner's discovery requests are deficient because he has made "no showing that the information sought is material to the merits" of any of his claims. *Stephens*, 570 F.3d at 213. Accordingly, Petitioner's requests for discovery are denied.

### (2) Expansion of Record / Evidentiary Hearing

Petitioner requests expansion of the record and/or an evidentiary hearing with respect to each of his claims. He seeks to expand the record with declarations from lead counsel Lorona (Doc. 41, Ex. F); appellate counsel Reeves (*id.*, Ex. D); mitigation specialist Christianson (*id.*, Ex. G); mitigation specialist Mary Durand (*id.*, Ex. C); managing court reporter, Denise Sanders Couvaras (*id.*, Ex. E); Dr. Sindelar (Doc. 51, Ex. 11); and individuals familiar with Petitioner's defense team, mental illness, drug abuse, background, and the circumstances surrounding the crime (Doc. 35, Ex's. 139, 140, 146-148; Doc. 41, Ex's. C, D, F, G, H ; Doc. 51, Ex. 13). He seeks to expand the record to include a police report regarding a prior drug possession incident, military records obtained by Holly Wake and the Office of the Federal Public Defender, and junior high and high school records (Doc. 35, Ex's. 135-37, 154, 155), as well as photographs from Petitioner's suicide attempt, and jail visitor logs (Doc. 41, Ex's. A, B). Petitioner also seeks to include Lorona's state bar

disciplinary record (Doc. 35, Ex. 152); the transcript of an interview of investigator Bachtle dated 7/11/05 (*id.*, Ex. 151); Dr. Robert Smith's curriculum vitae and psychological summaries (*id.*, Ex. 149; Doc. 51, Exs. 1, 2); and the transcript of Reeves' oral argument before the Arizona Supreme Court on June 1, 2004.[13] (Doc. 35, Ex. 150.)

Along with expansion of the record, Petitioner seeks an evidentiary hearing to hear testimony from Lorona, Claussen, Gitre, Reeves, Tafoya, Dr. Smith, Dr. Deming, Dr. Potts, Dr. Sindelar, Dr. Scialli, Dr. Lang, Dr. Shaw, Mark Barry, Judge Hutt, Michael Terribile, Larry Hammond, Stella Salinas, Holly Wake, Linda Christianson, Mary Durand, an expert on the legal issues surrounding competency in capital cases, an expert on the legal issues surrounding voluntariness, a "legal expert . . . and an expert in psychological ethical issues to address the problems with Dr. Lang's role in the case," and Petitioner's family and friends. (Doc. 51 at 83-84.)

According to Petitioner, his trial and appellate counsel will each testify about the various ways in which their performance was deficient; the defense investigator and mitigation specialists will testify about Lorona's "lack of effort"; the Rule 11 experts will testify that their examinations did not assess Petitioner's competency to waive mitigation; Drs. Smith and Deming will testify that Petitioner was incompetent to waive mitigation; Terribile and Hammond will testify about the funding problems of capital attorneys in Maricopa County; and the proposed new experts, medical and legal, will testify in accordance with the allegations advanced in Petitioner's habeas claims.

---

[13] Petitioner also asks to expand the record to include the state post-conviction hearing testimony and exhibits as well as a number of state court filings from his trial and sentencing, including orders dated 11/23/98 and 12/11/98 (Doc. 35, Ex's. 132, 133), and Petitioner's Notice of Appointment of Experts, Notice of Defenses, and Motion to Strike State's Notice of Witnesses and Aggravating Factors (*id.*, Ex's. 134, 153, and 157). Because these materials are already part of the state court record considered by the court, expansion of the record to include them is unnecessary. To the extent these items are offered to correct omissions in the state court record, the court has not applied the restrictions of § 2254(e)(2). *See Boyko v. Parke*, 259 F.3d 781, 790, 792 (7th Cir. 2001); *Dobbs v. Zant*, 506 U.S. 357, 359 (1993) (per curiam).

Respondents contend that Petitioner is not entitled to expansion of the record or an evidentiary hearing because he did not diligently develop the facts of his claims in state court. This court agrees.

As discussed above, Petitioner sought an evidentiary hearing in state court, and a hearing was granted with respect to his claim of ineffective assistance of trial counsel. The court finds that Petitioner, acting with reasonable diligence during the PCR proceedings, could have gathered all of the materials contained in his request to expand the record. While Petitioner complains that funding difficulties impeded PCR counsel's efforts, he makes no showing that such problems prevented him from obtaining declarations from trial and appellate counsel and members of the defense team. *See Ward v. Hall*, 592 F.3d 1144, 1159-63 (11th Cir. 2010) (rejecting argument that budget problems were responsible for petitioner's inability to develop claims in state court where he was "afforded approximately three years to secure affidavits and witness testimony prior to his state habeas evidentiary hearings and managed to submit numerous exhibits and affidavits during course of his hearings, including affidavit testimony from family members, friends, acquaintances, and former jurors"); *Roberts v. Dretke*, 381 F.3d 491, 500-01 (5th Cir. 2004) (finding that "no action by the state habeas court prevented Roberts from seeking an affidavit . . . despite fact that the state habeas court could have been more helpful with regards to funding and holding an evidentiary hearing"); *Dowthitt*, 230 F.3d at 758 ("Dowthitt's arguments that lack of funding prevented the development of his claims are also without merit. Obtaining affidavits from family members is not cost prohibitive.").

Similarly, PCR counsel acting with reasonable diligence could have obtained Petitioner's school and military records, information concerning his prior drug charge, jail visitor logs, and photographs of his suicide attempt. All of this information was readily available.

In addition, as noted above, the majority of the proposed witnesses testified during the PCR evidentiary hearing. Nothing prevented Petitioner from questioning any of these

witnesses, and Petitioner had the opportunity to make any relevant inquiries at that time. To the extent Petitioner wants to develop additional facts through the testimony of the same witnesses, he has not demonstrated that he diligently attempted to develop such facts in state court. If he intends to present the same testimony in federal court that he presented in state court, he has failed to demonstrate that the state hearing was not full and fair or that the state court failed to reliably find the relevant facts. *Townsend*, 372 U.S. at 318.

Petitioner also seeks to call a number of witnesses who did not testify at the PCR evidentiary hearing. These include appellate counsel, a legal expert, Judge Hutt, the prosecutor, and Drs. Smith and Deming. Along with Petitioner's failure to exercise diligence in developing the factual bases of his claims in state court, he has also failed to identify any relevant disputed facts the resolution of which requires an evidentiary hearing. Petitioner's competence to plead guilty, while disputed now, was the subject of contemporaneous mental health evaluations which all reached the same conclusion. His competency to waive mitigation – along with other issues associated with counsel's performance at sentencing – was the subject of the extensive evidentiary hearing in state court. With respect to these issues, Petitioner "has not established that an evidentiary hearing would produce evidence more reliable or more probative than the medical records and expert opinion" that already are part of the record before this Court. *Griffin v. Johnson*, 350 F.3d 956, 966 (9th Cir. 2003); *see Totten v. Merkle*, 137 F.3d at 1176.

In *Landrigan*, the Supreme Court explained that the criteria for determining whether an evidentiary hearing is required must take into account the AEDPA's deferential standard of review:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.
>
> It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.

550 U.S. at 474 (citations and footnoted omitted).

Application of this standard highlights the deficiencies of Petitioner's request for an evidentiary hearing. The reasonableness of the state court's decisions rejecting Petitioner's claims is not undermined by the factual allegations advanced in Petitioner's motion. These allegations simply restate the arguments made in state court and in the habeas petition. Thus, even if a hearing would produce evidence in support of the allegations, Petitioner would not be entitled to relief.

Finally, Petitioner cannot meet the exceptions to the diligence requirement of 18 U.S.C. § 2254(e)(2), according to which he must show that his claims rely on a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court or that he could not have previously discovered the factual predicate of his claims through due diligence, and that the facts underlying the claims would establish that but for constitutional error, no reasonable factfinder would have found him guilty of the Reynolds murder. Therefore, Petitioner is not entitled to expand the record or to an evidentiary hearing on his claims.[14]

**C.     Summary**

"Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. at 437. Petitioner's motion for evidentiary development seeks to use these habeas proceedings to re-litigate his challenges to his guilty pleas, waiver of mitigation, and sentencing proceedings, as well as the outcome of his direct appeal and the postconviction proceedings. The facts and evidence Petitioner now wishes to present could

---

[14]     The court also rejects Petitioner's assertion that he is entitled to evidentiary development because the new evidence "does not fundamentally alter the nature of the claim presented in state court." (*See, e.g.*, Doc. 51 at 30.) Petitioner's argument appears to conflate the exhaustion requirements of § 2254(b)(1)(A) with the diligence requirements of § 2254(e)(2). These are two separate inquiries. *See, e.g.*, *Winston v. Kelley*, 592 F.3d 535, 551 (4th Cir. 2010); *Richey v. Bradshaw*, 498 F.3d 344, 352 (6th Cir. 2007); *Lopez v. Schriro*, 491 F.3d 1029, 1040, 1041 n.8 (9th Cir. 2007).

"have been previously discovered through the exercise of due diligence," § 2254(e)(2)(A)(ii), and because Petitioner has not alleged the existence of disputed relevant facts that would entitle him to relief under the deferential standards of the AEDPA, *Landrigan*, 550 U.S. at 474, his requests for evidentiary development are denied.

## V. CONCLUSION

For the reasons set forth above, Petitioner has failed to show that he is entitled to habeas relief on any of his claims. Additional evidentiary development is neither required nor warranted.

Pursuant to Rule 11 of the Rules Governing § 2254 Cases, the Court has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability (COA). *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court finds that reasonable jurists could debate its resolution of Claims 1 and 3-11. For the reasons stated in this order, the Court declines to issue a COA with respect to any other claims.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 35) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Petitioner's motion for evidentiary development

(Doc. 51) is **DENIED**.

   **IT IS FURTHER ORDERED** that the stay of execution entered by this Court on April 21, 2009 (Doc. 6), is **VACATED.**

   **IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

   Whether Claim 1 of the Amended Petition – alleging that Petitioner is entitled to relief based on *Ring* error – is without merit.

   Whether Claim 3 – alleging that the state courts violated Petitioner's rights by applying a causal connection test to his mitigating evidence – is without merit.

   Whether Claim 4 – alleging that trial counsel performed ineffectively with respect to Petitioner's competency to waive mitigation and the presentation of mitigating evidence – is without merit.

   Whether Claim 5 – alleging that the trial court failed to make an adequate determination of Petitioner's competence to waive mitigation – is without merit.

   Whether Claim 6 – alleging that Petitioner was incompetent to waive mitigation – is without merit.

   Whether Claim 7 – alleging ineffective assistance of appellate counsel with respect to the handling of Claims 5 and 6 – is without merit.

   Whether Claim 8 – alleging that trial counsel performed ineffectively by failing to ensure that Petitioner's guilty pleas were knowing, intelligent, and voluntary – is without merit.

   Whether Claim 9 – alleging that Petitioner's guilty pleas were not knowing, intelligent, and voluntary – is without merit.

   Whether Claim 10 – alleging that the trial court failed to make an adequate determination of Petitioner's competence to plead guilty – is without merit.

   Whether Claim 11 – alleging that Petitioner was incompetent to plead guilty – is procedurally barred.

   Whether Claim 11 – alleging that appellate counsel performed ineffectively in handling the issue of Petitioner's competence to plead guilty – is without merit.

1      **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

2  this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

3  85007-3329.

4      DATED this 2nd day of September, 2010.

5

6  _____

7                     Frederick J. Martone
                  United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28